**CITY OF CORPUS CHRISTI, Texas, et al., Appellants,**

v.

**Jack DAVIS, et ux., Appellees.**

**No. 13233.**

Court of Appeals of Texas, Austin.

Oct. 7, 1981.

Rehearing Denied Nov. 4, 1981.

---

Gerald L. Benadum, Wood & Burney, Corpus Christi, for City of Corpus Christi.

Mark White, Atty. Gen., Sharon Gillespie, Asst. Atty. Gen., Austin, for School Land Bd. of State of Texas.

Charles W. Cromwell, Wade & Cromwell, Corpus Christi, for appellees.

SHANNON, Justice.

Jack Davis and Kathleen G. Davis, husband and wife, filed suit in the district court of Travis County against The State of Texas[1] concerning title to 3.762 acres of land reclaimed by the City of Corpus Christi

---

1. The 65th Legislature granted the Davises permission to file a trespass to try title against the State in the district court of Travis County.

from the waters of Corpus Christi Bay. The City of Corpus Christi intervened in the suit. The Davises sought damages from the City for the claimed loss of their littoral rights. After a bench trial, the district court rendered judgment, among other things, that title to the acreage is in the State and that the Davises recover $80,-000.00 for the inverse condemnation by the City of their littoral rights. The Davises and the City have taken appeals from that judgment.

In 1956, the Davises purchased a 17.95–acre tract fronting on Corpus Christi Bay. Their chain of title stems from an 1849 patent that describes the southeastern boundary of the land patented as running with the meanders of Corpus Christi Bay. The patent does not purport to include any land covered by the waters of the Bay. The 3.762 acres in controversy is a part of the 17.95–acre tract and is situated on the bay side of the tract.

In 1956, a part of the Davis tract was below the mean high tide line. By June, 1977, 3.762 acres of that tract were below the mean high tide. The Davises contend that all of the 17.95 acre tract was above the mean high tide in 1905 when it was surveyed by the Nueces County Surveyor.

The district court found as a fact that since 1905 or at an earlier date, whatever part of the area in dispute which may have been above the mean high tide at some time, became submerged. The court determined further that the area in dispute was reduced in elevation by a series of severe weather episodes such as in-bound hurricanes and northers to below the line of the mean high tide of Corpus Christi Bay. There was no contention that the acreage in dispute was adversely affected by subsidence.

In 1976, the School Land Board, which had been given title to land owned by the State beneath the sea, leased 3.61 acres of the land in controversy to the City. Thereafter, the City and the Corps of Engineers in a joint project undertook to reclaim the beach, including the area in dispute, by filling in and thereby raising the elevation of the beach. This extended the shoreline some 200 feet to 250 feet bayward from the Davises' mean high tide line. As a result, the Davises' land which had been formerly shoreline was separated from the Bay by the reclaimed public beach.

The district court concluded, *inter alia*, that the State owns all of the bottom of Corpus Christi Bay below the line of mean high tide adjacent to the Davis property. The district court concluded further that whenever the line of mean high tide moves landward, *by whatever cause*, the State of Texas gains title to the land newly included within the area below that line. Being of the view that the cause of the landward movement of the line of mean high tide was immaterial, the district court filed no conclusions of law determining whether the movement in this case was caused by erosion or avulsion.

## TITLE TO THE 3.762 ACRES

The Davises seek reversal of the judgment vesting title in the acreage in the State claiming that the rules of avulsion are applicable to Corpus Christi Bay, that they proved the disputed acreage submerged beneath the water as the result of avulsive action, and, accordingly, that they retained title to the land. Their principal authority is *Coastal Industrial Water Authority v. York*, 532 S.W.2d 949 (Tex.1976).

In defense of the judgment of the district court, the City and State rely upon the rule that whenever the line of mean high tide moves landward, the upland owner loses title to the State to the land newly included within the area below the mean high tide. *State v. Balli*, 144 Tex. 195, 190 S.W.2d 71, 100 (1944). This is so, these parties argue, irrespective of the cause of the landward movement of the line of mean high tide.

Alternatively, the City and the State argue that should the rule of avulsion be applicable to tidal lands, the Davises failed to rebut the presumption of ownership in the State by showing that the acreage was covered by water as a result of avulsion. These parties claim, instead, that the loss of land came about by erosion.

■■■ A preliminary, and important inquiry is whether the doctrine of avulsion is applicable to land fronting the bays, inlets, and arms of the Gulf of Mexico within tidewater limits. It is settled law that title to land covered by the bays, inlets, and arms of the Gulf of Mexico within tidewater limits is in the State, and such lands constitute public property that is held in trust for the use and benefit of all the people. *Lorino v. Crawford Packing Co.*, 142 Tex. 51, 175 S.W.2d 410 (1943). The dividing line between State ownership of the Bay and private ownership of the upland is the line of mean high tide for patents issued after 1840. *Rudder v. Ponder*, 156 Tex. 185, 293 S.W.2d 736 (1956). With respect to the landward advance of the line of mean high tide, the Supreme Court has written that if the sea encroaches and the upland owner loses his land, he has no redress. *State v. Balli, supra.* The City and State regard the sum of these authorities, *Lorino, Rudder,* and *Balli*, to be tantamount to the conclusion reached by the district court that whenever the line of mean high tide moves landward, by whatever cause, the State acquires title to the land newly included within the area below the line.

This Court has not discovered any Texas authority holding that the doctrine of avulsion is applicable to tidal lands. The Davises rely primarily upon general principles stated in *Coastal Industrial Water Authority v. York, supra.* That case involved a dispute between the riparian owner and the water authority as to ownership of 3.353 acres of land that had subsided below the water level of the Houston Ship Channel. The loss in surface elevation came about from the reduction in subsurface pressure by the removal of large amounts of underground water for industrial and municipal uses. There was no displacement of the submerged land in relation to the bed of the ship channel. The water was not deep enough above the disputed acreage to permit navigation.

The Court in *York* noticed the rules pertaining to erosion and accretion and to avulsion. Although the Court reaffirmed the rules with respect to property loss and gain due to erosion and accretion, those rules were not employed by the Court in its determination that the riparian owner held title to the submerged land since there was no erosion involved, only subsidence. In a narrow holding, the Court concluded that in case of subsidence of land below navigable waters where there is no conflict between private and public interests concerning navigation over the subsided land, title to that land remains in the riparian owner. The opinion was specifically limited to non-tidal waters. In a footnote in *York, supra* at 951–52, Justice Reavley emphasized the narrowness of the holding and cautioned against misinterpretation of its effect upon lands within reach of the tide.

"York's tract lies at the confluence of the San Jacinto River and the Houston Ship Channel (known also as Buffalo Bayou). There is a statement volunteered by one of the witnesses indicating that the site is reached by the Gulf tide. Indeed, it may be that subsidence may pose no boundary problem for navigable streams above sea level. The Court of Civil Appeals opinion states that the question in this case concerns title to land bounded by water 'within tide water limits.' 520 S.W.2d 499. The parties have not, at any point in this litigation, made any reference to the fact or legal effect of the tide. For this reason the Court's opinion is restricted to the issues presented by the peculiar facts of this record and the contentions of these parties. The writer of this opinion, speaking personally, chooses to emphasize the narrowness of the holding and to warn against any misinterpretation of its effect upon the boundary of private ownership to lands within reach of the tide. There may be cases where the private development and use of land will require a holding that the ownership is not changed by submergence under tidewater due to subsidence. There may be cases where public rights are not prejudiced by permitting title to remain unchanged until the private owner has a reasonable opportunity to reclaim his land from the sea. However, the rule of *Luttes v.*

*State*, 159 Tex. 500, 324 S.W.2d 167 (1958) stands. I doubt that a court would accept a rule that located the boundary of private ownership at the Luttes lines *as of the time when nonavulsive subsidence commenced.* That rule would allow private owners generally to hold title to land under the sea, would restrict the enjoyment of public beaches, and would make the location of seaward boundaries an exercise of pure guesswork."

This Court, of course, recognizes *Coastal Industrial Water Authority v. York, supra,* but is of the view that it has no controlling effect on the disposition of this appeal. The case at bar, unlike *Coastal Industrial Water Authority v. York,* concerns tidal land and, further, is not a subsidence case.

The language in *Balli* relied upon by the City and the State is not the holding in that case, but it is at least an expression by the Supreme Court in support of the district court's implied conclusion that the rule of avulsion is not applicable to tidal lands. In addition to the language in *Balli*, major considerations of public policy support the district court's conclusion. Application of the rule of avulsion to tidal lands would permit private ownership of land under the sea, would restrict the enjoyment of public beaches, would jeopardize the right of the public to navigate upon and to fish in the State's waters, and would render the location of seaward boundaries an exercise of pure guesswork. See *Coastal Industrial Water Authority v. York, supra,* at 952.

■ The question of applicability of the doctrine of avulsion to tidal lands is of such prime importance that it should be determined by the Supreme Court, and not by this Court. Nevertheless, for purposes of this opinion, this Court will assume that the rule of avulsion is applicable to tidal lands. Even so, we affirm the district court's judgment that title to the acreage in dispute is in the State. Because the acreage in question was covered by the sea at the time of the commencement of the reclamation project, it is presumed that title is in the State. This Court has concluded that the Davises failed to overcome that presumption by proving that the disputed acreage submerged as the result of avulsion.

The Davises' case rests primarily upon the testimony of Dr. Armstrong Price, an oceanographer who has been familiar with Corpus Christi Bay since 1927. Dr. Price testified that shorelines along Corpus Christi Bay in their natural state oscillate back and forth within a known range. After a hurricane, the oscillation may be as much as thirty or forty feet. In its natural state, North Beach, after damage by a hurricane, would be renewed or regenerated by sand moving from one area to another. Dr. Price termed this process "dynamic equilibrium." The regeneration process takes much longer, a number of years, as opposed to the time taken for a hurricane to eat away the thirty or forty feet, usually a day or two. Construction in the Bay, such as the Ship Channel and various breakwaters, has upset the natural renewal process.

Dr. Price's understanding of avulsion changes was that such changes were "supposed to be very sudden." The definition for erosion furnished Dr. Price was a "gradual and unperceptible washing away." In that context, he testified that North Beach, including the Davis property, had been subject to avulsion changes caused by northers and hurricanes. He stated that although northers may be damaging to the shoreline, hurricanes are dominant "shapers" of the shoreline. Dr. Price admitted, nevertheless, there are nonstorm erosive forces remaining at North Beach which help shift the shoreline. Bruce Collins, Jr., who has been long familiar with North Beach, testified by deposition that in the periods between hurricanes, the shoreline continues to erode slowly away.

■ In general, it is said that a riparian or littoral owner loses title to land gradually or imperceptibly taken from his shore. Erosion is the process of wearing away the land. The sudden removal of land by rapid or perceptible change is termed avulsion. It is usually held that title does not pass by avulsion. *Coastal Industrial Water Authority v. York, supra;* See 5A Thompson on Real Property §§ 2561, 2562 (Grimes ed. 1978).

Although there is a conflict of authority as to what is "gradual and imperceptible" so as to constitute erosion, the law of the State has been committed to the following test: "though the witnesses may see, from time to time, that progress has been made, they could not perceive it while the progress was going on." *Denny v. Cotton,* 3 Tex.Civ.App. 634, 22 S.W. 122, 124 (1893, writ ref'd). The application of the quoted test for "gradual and imperceptible" has resulted in holdings of erosion where the change wrought to the land has been indeed both sudden and perceptible.

An early and leading case is *Nebraska v. Iowa,* 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892). In that case the dispute arose between the states of Nebraska and Iowa over their common boundary formed by the Missouri River. Because of the force of floods, the river banks shifted markedly between 1851 and 1877. Nebraska claimed that because the fall of the river banks into the river was sudden and visible, the rule of avulsion obtained and that the land so lost remained a part of Nebraska. The Supreme Court rejected Nebraska's claim, writing at 368, 12 S.Ct. at 399–340:

"The current is rapid, far above the average of ordinary rivers; and by reason of the snows in the mountains there are two well known rises in the volume of its waters, known as the April and June rises. The large volume of water pouring down at the time of these rises, with the rapidity of its current, has great and rapid action upon the loose soil of its banks. Whenever it impinges with direct attack upon the bank at a bend of the stream, and that bank is of the loose sand obtaining in the valley of the Missouri, it is not strange that the abrasion and washing away is rapid and great. Frequently, where above the loose substratum of sand there is a deposit of comparatively solid soil, the washing out of the underlying sand causes an instantaneous fall of quite a length and breadth of the superstratum of soil into the river; so that it may, in one sense of the term, be said that the diminution of the banks is not gradual and imperceptible, but sudden and visible.

Notwithstanding this, two things must be borne in mind, familiar to all dwellers on the banks of the Missouri River, and disclosed by the testimony: that, while there may be an instantaneous and obvious dropping into the river of quite a portion of its banks, such portion is not carried down the stream as a solid and compact mass, but disintegrates and separates into particles of earth borne onward by the flowing water, and giving to the stream that color which, in the history of the country, has made it known as the 'muddy' Missouri; and, also, that while the disappearance, by reason of this process, of a mass of bank may be sudden and obvious, there is no transfer of such a solid body of earth to the opposite shore, or anything like an instantaneous and visible creation of a bank on that shore. The accretion, whatever may be the fact in respect to the diminution, is always gradual and by the imperceptible deposit of floating particles of earth. There is, except in such cases of avulsion as may be noticed hereafter in all matters of increase of bank, always a mere gradual and imperceptible process. There is no heaping up at an instant, and while the eye rests upon the stream, of acres or rods on the forming side of the river. No engineering skill is sufficient to say where the earth in the bank washed away and disintegrating into the river finds its rest and abiding place. The falling bank has passed onto the floating mass of earth and water, and the particles of earth may rest one or fifty miles below, and upon either shore. There is, no matter how rapid the process of subtraction or addition, no detachment of earth from the one side and deposit of the same upon the other. The only thing which distinguishes this river from other streams, in the matter of accretion, is in the rapidity of the change caused by the velocity of the current; and this in itself, in the very nature of things, works no change in the principle underlying the rule of law in respect thereto."

*Nebraska v. Iowa* has been followed by the Court of Civil Appeals in *Denny v. Cotton, supra*, and by the Supreme Court in *Hancock v. Moore*, 135 Tex. 619, 146 S.W.2d 369 (1941).

■ As this Court understands *Nebraska v. Iowa, supra, Hancock v. Moore, supra*, and *Denny v. Cotton, supra*, erosion can be both sudden and perceptible, and does not have to be always gradual and imperceptible. Losses to the shoreline at North Beach due to hurricanes and northers are not nearly so sudden as river banks tumbling into the Missouri, Rio Grande, and Red Rivers. Moreover, the losses to the shoreline because of storms would seem much less perceptible than the caving-in of river banks. The Texas coast is subject to frequent northers and hurricanes, just as the Missouri, Rio Grande and Red Rivers are subject to violent rises and strong currents. Upon authority of *Nebraska, Denny*, and *Hancock*, this Court holds that the loss to the shoreline was erosive and that the Davises lost title to the disputed acreage.

There is a further reason that the judgment vesting title in the State should be affirmed. It is undisputed that not all the shoreline loss was attributable to sudden and obvious causes, although it is true that hurricanes and northers have been responsible for a substantial part of the total loss of the shoreline. Nevertheless, the evidence is that forces other than hurricanes and northers, such as summertime night winds and quick water action, are at work slowly shifting away the sands of North Beach. Such forces are classically erosive, not avulsive. The Davises failed to overcome the presumption that the State held title to the disputed acreage by proving that the total loss of the shoreline resulted from avulsive action.

### MEASURE OF DAMAGES FOR LOSS OF LITTORAL RIGHTS

■ In their trial petition, the Davises alleged that the City by reclaiming the beach had cut them off from the sea and, accordingly, had denied them their littoral ownership rights without just compensation. The district court found that the Davises' loss of littoral ownership had caused them to suffer damages in the sum of $80,000.

The City complains that there was no evidence showing the difference between the market value of the Davises' property with littoral rights and the market value of the property without littoral rights. The damages awarded by the district court did not refer to the difference in the value of the Davises' property before and after the loss of littoral rights, but instead referred to the loss of one littoral right, the opportunity to cultivate an offshore oyster bed. We sustain the City's point.

The City admits that the Davises were littoral owners prior to the reclamation of the beach and that as a result of that project, they ceased to be littoral owners.

■ Littoral rights are appurtenant to the land which borders a lake or sea. Littoral rights, at common law, consist of the right of access to the water, the right to any accretions, and the right to build wharves, docks, and piers. *Gibson v. Carroll*, 180 S.W.2d 630 (Tex.Civ.App. 1915, no writ). In addition, Tex. Parks & Wild. Code Ann. § 76.004(c) (Vernon 1976) grants the littoral owner the right to maintain an oyster bed within one hundred yards from the shore.

This Court has been shown no Texas case making the determination whether littoral rights are to be valued separately, as in the case at bar, or rather are to be treated as part of the market value of land in condemnation cases. The proper rule in our view, however, is stated in 4 NICHOLS, LAW OF EMINENT DOMAIN, § 13.23 (Rev.3rd Ed., 1980):

"Water rights appurtenant to real property and subjected to the power of eminent domain, include such sub-surface interests as percolating waters and underground streams, and such surface interests as riparian rights. These interests constitute property for the taking of which the owner is entitled to compensation."

"In determining such compensation, as in the case of other assets of the real property to which they are appurtenant, it is not proper to evaluate separately such appurtenant rights. Consideration is given only to the effect of such appurtenances upon the market value of the property to which they are appurtenant. Consequently, where such rights are affected by an appropriation, diversion, or pollution of the waters, the measure of damages is the depreciation thereby caused in the market value of such property."

*Accord: Dugan v. Rank,* 372 U.S. 609, 625, 83 S.Ct. 999, 1009, 10 L.Ed.2d 15 (1963).

The judgment is reversed insofar as it awards damages for the inverse condemnation of littoral rights and that cause is severed and remanded for trial pursuant to this opinion; the judgment, in all other respects, is affirmed.

POWERS, J., not participating.