**NATLAND CORPORATION, et al., Appellants,**

**v.**

**BAKER'S PORT, INC., and Baker Marine Corporation, Appellees.**

No. 13–90–483–CV.

Court of Appeals of Texas, Corpus Christi.

June 30, 1993.

Opinion Overruling Motion for Rehearing Oct. 14, 1993.

Rehearing Overruled Nov. 30, 1993.

**54**

Charles R. Porter, Jr., Rick Foster, Porter, Rogers, Dahlman, Gordon & Lee, Corpus Christi, Linda Broocks, Stephen Krebs, Baker & Botts, Houston, Liz Bills, Asst. Atty. Gen., Energy Div., Dan Morales, Atty. Gen., Joe R. Greenhill, Bob E. Shannon, Baker & Botts, Austin, Peter M. Oxman, Baker & Botts, Houston, Ken Cross, Asst. Atty. Gen., Environmental Protection Div., Ed Salazar, Asst. Atty. Gen., Nancy Lynch, Asst. Atty. Gen. Chief, Environmental Protection Div., Austin, for appellants.

Richard B. Stone, Law Offices of Stone & Stone, Corpus Christi, Richard A. Schwartz, Richard A. Schwartz & Associates, Houston, for appellees.

Charles Butler, Corpus Christi, for intervenor.

Lawrence A. Dio, Port Lavaca, Eli Mayfield, Palacios, Kathryn F. Green, Kleberg & Head, J. Michael Mahaffey, Kleberg & Head, Corpus Christi, for other interested parties.

Before NYE, C.J.,* and DORSEY and FREDERICO G. HINOJOSA, Jr.

* Former Chief Justice retired April 30, 1993.

## OPINION

DORSEY, Justice.

This appeal concerns title to 2,800 acres of coastal land sold by Natland Corporation, National Steel Corporation and NS Land Company (collectively "Natland") to Baker's Port, Inc. and Baker Marine Corporation (collectively "Baker"). Baker did not develop the property as planned, claiming that defects of title and encumbrances against the land prohibited the intended uses. Baker sued Natland for fraud, violations of the Texas Deceptive Trade Practices–Consumer Protection Act,[1] and breaches of warranty. The State became a party, seeking a declaratory judgment that it owned 36 acres of the land in dispute and that another part of the 2,800 acres, consisting of 229 acres, was subject to restrictions for the benefit of the public under the "public trust doctrine."

The trial court entered a partial summary judgment against the State on both claims, from which it appeals. After a jury trial, Baker took judgment against Natland for $360,000 for certain title defects and $22,000,-000 for fraud and DTPA violations in connection with the sale of the property.[2] We affirm the summary judgment against the State, but reverse and remand the remainder of the judgment for new trial.

In 1981, Larry Baker, Sr., of Baker Marine Corporation, approached Natland about purchasing 2,800 acres of coastal land in San Patricio, Aransas, and Nueces Counties, near the City of Ingleside. Mr. Baker had leased one end of this property for a shipyard business for many years. He intended to use the 2,800 acres to develop a private shipbuilding community of both homes and businesses, to be called Baker's Port, with four private channels controlled by Baker, and with access to public waters—the Corpus Christi Ship Channel, the Intracoastal Waterway, and the Gulf of Mexico. In the summer of 1981, Natland sold the property to Baker, subject to certain restrictions and encumbrances, for $31,668,000, consisting of cash and notes.

In early 1988 Baker learned of title defects and other encumbrances and claims against the property not reserved or excepted in the deed. Mr. Baker complains that Natland showed him an inaccurate 1962 survey, the Huston map, which Natland represented to show the property that it owned, but which incorrectly identified its boundaries. In particular, the Huston map incorrectly represented that Natland owned the Garrett, Brashear, and Overbid tracts of land along the northern border of the property, as well as approximately 29 acres of State-owned submerged lands off the eastern shoreline and parallel to the Intracoastal Waterway. Baker alleges that Natland's attorney persuaded Baker's attorney to accept an inaccurate metes and bounds description derived from the Huston map and to include it in the General Warranty Deed conveying the property.

Baker also contends that Natland failed to disclose certain other title defects and encumbrances against the property. The first, a 229 acre tract of partially submerged lands in the center of the property, was allegedly encumbered by a right of the public to use it for public recreation and by an implicit restriction that the land could only be used for navigation purposes. This tract is referred to as Patent 198. Baker also complained of the existence of a perpetual spoil easement in favor of the United States, and a claim by the State of Texas to 36 acres of dry land along the shore that would make the Baker's Port channels inaccessible to the water.

These defects and encumbrances allegedly hindered development of the Baker's Port project, and the company abandoned it. Baker sued Natland for breach of warranty, fraud, and violations of the DTPA, based on the title defects and undisclosed encumbrances against the property.

The State entered this suit seeking a declaratory judgment (1) that it owned 36 acres of dry land that had been added to the shoreline by the gradual migration of soil deposited along the shoreline by the United

---

1. Tex.Bus. & Com.Code Ann. §§ 17.41, et seq. (Vernon 1987).

2. The $22,000,000 was labelled an off-set against Baker's remaining $19,000,000 debt due to Natland on the purchase price of the property.

States Army Corps of Engineers while dredging the adjacent Intracoastal Waterway, and (2) that a public trust encumbrance attached to the 229 acre tract. The trial court granted a partial summary judgment disposing of the State's claims, declaring that Natland had title to the 36 acres, and that the 229 acre tract was free of any public trust encumbrance.

The central issues at trial between Natland and Baker were the effect of the encumbrances and title defects on Baker's ability to develop the land in accordance with its plans, and the damages flowing from such defects. (See appended map) Specifically, Baker alleged breaches of the warranty against encumbrances with regard to the Patent 198 reservations on the 229 acre tract and with regard to the spoil disposal easement. Baker alleged breaches of the warranty of title with regard to the tracts of land incorrectly included in the Huston map. Baker also alleged violations of the DTPA, and fraud with regard to Natland's misrepresentation of the property conveyed and failure to disclose the various defects and encumbrances.

The jury returned a verdict generally in favor of Baker. On the claims for breach of the warranty against encumbrances, the jury found $6,330,000 in damages resulting from the Patent 198 reservations on the 229 acre tract, but no damages resulting from the spoil disposal easement. On the claims for breach of the warranty of title, the jury found breaches with regard to the Garrett, Brashear, and State-owned submerged-land tracts, but not the Overbid Tract. It found damages in the amount of an $8,800 fair market value for the Brashear Tract and a $360,000 fair market value for the State-owned submerged lands, but found no damages were proximately caused by the breach of title with regard to the Garrett Tract. On the DTPA and fraud claims, the jury found $22,000,000 as the difference between the

value of the property as it was received and as represented. The trial court granted final judgment, generally in accordance with the jury's verdict in favor of Baker, against Natland for $360,000, and ordered that Baker's $19 million dollar debt to Natland was fully offset by $22,000,000 in damages.[3]

## I. STATE'S APPEAL

We first address the State's appeal from partial summary judgment rendered in favor of Natland, both (1) that 36 acres of land along the shore of Redfish Bay adjacent to the westerly right-of-way line of the Intracoastal Canal belonged to Natland under the doctrine of accretion, and (2) that 229 acres of partially submerged lands granted to Natland's predecessor in title under Patent 198 were conveyed in fee simple, subject only to the specific reservations therein, and that no implied "public trust" restriction applied to the land.

### A. The Creation of Dry Land

By its first point of error, the State contends that the trial court erred in holding that 36 acres of land along the shoreline belonged to Natland and not the State. The State argues that the eastern boundary of Natland's property should be the shoreline as it existed in 1958, before the additional 36 acres of dry land was created.

The undisputed facts are that the 36 acres at issue are presently dry land that had been submerged prior to the dredging of the intracoastal waterway. The dredging was done by the U.S. Army Corps of Engineers and its contractors in 1959 and 1960. The spoil dredged in the process of creating the canal was piled on dry land inland from the shore during those years, pursuant to a spoil disposal easement granted by Natland's prede-

---

**3.** We note that the judgment failed to award Baker damages for breach of title based on the Brashear tract, and that the jury finding of $6,330,000 in damages for breach of the warranty against encumbrances concerning the 229 acre tract was apparently subsumed within the award of $22,000,000 for fraud and DTPA violations. Baker does not complain about either action of the trial court.

In addition, however, a portion of the judgment does award damages to the Jimmie C Brashear Trust and the Brashear Life Trust, parties below not subject to the present appeal. We do not disturb the judgment rendered in favor of these parties, about which none of the parties on appeal have complained.

cessor in title.[4] In subsequent years, by the action of rain, wind and gravity, some of the spoil gradually was washed from the piles toward the sea, extending the land seaward. The State argues that it still owns this 36–acre extension which had formerly been submerged lands.

■ Title to land covered by the bays, inlets, and arms of the Gulf of Mexico within tidewater limits is in the State, and those lands constitute public property that is held in trust for the use and benefit of the people. *Lorino v. Crawford Packing Co.*, 142 Tex. 51, 175 S.W.2d 410, 413 (1943); *City of Corpus Christi v. Davis*, 622 S.W.2d 640, 643 (Tex. App.—Austin 1981, writ ref'd n.r.e.); *Butler v. Sadler*, 399 S.W.2d 411, 415 (Tex.Civ. App.—Corpus Christi 1966, writ ref'd n.r.e.).

■ However, the general rule is that a riparian or littoral owner acquires or loses title to the land gradually or imperceptibly added to or taken from his shoreline. Erosion is the process of wearing away the land, while accretion is the process of gradual enlargement. *Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949, 952 (Tex.1976); *State v. Balli*, 144 Tex. 195, 190 S.W.2d 71, 100–01 (1944). Specifically, accretion denotes the natural process of increasing real property by the gradual and imperceptible disposal of solid material to the shoreline. *Butler*, 399 S.W.2d at 421. Shoreline property owners' rights, littoral rights, thus include the right to any accretions. *Davis* at 646; *Gibson v. Carroll*, 180 S.W. 630, 632 (Tex.Civ.App.—San Antonio 1915, no writ).

■ This right to accretions, however, does not allow the littoral, or upland, owner to increase his holdings by artificially building up submerged land into dry land along his shoreline. Man-made or artificial additions of this kind by the upland owner do not change the boundaries between his land and the State's. In *Lorino*, for instance, the owner of an offshore oyster house gradually built up a dry-land connection to the shore by continually dumping oyster shells into the water. The Texas Supreme Court held that title to the dry land created by artificial means did not pass to the upland owner as an accretion, but remained in the State. *Id.* at 414.

Some language in *Lorino* might suggest that any addition to the shoreline that has been influenced in the slightest by artificial means is not an accretion passing title to the upland owner. However, later Texas cases suggest that the artificial nature of additions to, or subtractions from, the shoreline is not necessarily determinative of the question of whether title shifts under the doctrines of accretion and erosion. In *York*, for instance, the court held that the subsidence of land along a channel due to artificial underground drainage did not divest the upland owner of title to the newly-submerged portion of his lands. 532 S.W.2d at 952. The court stated, with regard to the causes of the subsidence, that "[w]e place no significance upon the relation between artificial and natural causes of this phenomenon," and cited *Lorino* for the narrow rule that the upland owner may not acquire title through self-help by filling and raising the land level. *York*, 532 S.W.2d at 952.

In *State v. Baxter*, the upland owner's shoreline had been extended over a number of years by the accumulation of sediment at the mouth of the Colorado River. 430 S.W.2d 547 (Tex.Civ.App.—Waco 1968, writ ref'd n.r.e.). This accumulation was accelerated after the destruction of a huge logjam of floating debris, a public works project. Nevertheless, the court of appeals found sufficient evidence that the accumulation was an accretion belonging to the upland owner. *Id.* at 548.

In *Davis*, the City reclaimed an eroded beach, title to which was then claimed by the upland owners. Central to the court's decision in *Davis* was that the upland owners had initially been divested of title by the process of erosion. *Id.* at 643. However, the evidence suggested that this erosion process was not entirely natural. Without human intervention, the process of erosion by periodic storm damage would have been balanced

---

4. The federal government had a right to dredge the submerged lands in question by virtue of its dominant navigational servitude over all naviga-

ble waters. *See United States v. Rands*, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967).

by the slow natural replacement of the beach through accretion. However, artificial structures had been erected which interfered with the process of accretion. As a result of these artificial structures, unchecked erosion was unnaturally allowed to divest the upland owners of their property.

The holdings in *Baxter* and *Davis* would be inconsistent with an analysis of accretion or erosion that asked merely whether the process was uninfluenced by artificial means. Although the direct causes of the accretion in *Baxter* and of the erosion in *Davis* were the natural forces of the waters and currents on sediment and soil, those natural forces had themselves been influenced by artificial means, such that but for man's intervention nature would not have changed the shoreline in this way.

In the modern world, purely natural phenomena wholly uninfluenced by man and his works are rare if not non-existent. This is especially evident where water reacts with land. Every dam upstream creating a reservoir affects the building of a stream's delta, as every jetty into the Gulf of Mexico influences the currents traveling the shoreline carrying sand from one beach to the other. The distinction between wholly natural and artificially-influenced changes in the shoreline is unworkable as the sole criterion to determine the ownership of land along the shore.

The majority of our sister states hold that title to formerly submerged land that has been built up by artificially-induced means outside the upland owner's control vests in the upland owner, unless the State has an independent navigational or other public purpose to justify its continued ownership. *See Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); *Michaelson v. Silver Beach Improvement Ass'n,* 342 Mass. 251, 173 N.E.2d 273 (1961); *State v. Gill,* 259 Ala. 177, 66 So.2d 141 (1953). According to this line of authority, unless the upland owner himself somehow caused the additions to his land at the State's expense, the fact that the submerged land is now dry extinguishes the State's interest in it, absent some other public purpose for which the State may claim continued title to the land.

*Bonelli,* 414 U.S. at 322–23, 94 S.Ct. at 524–25; *see also* 78 Am.Jur.2d *Waters* § 410 (1975).

■ We believe that the principles followed in the out-of-state authorities and suggested by *York, Baxter,* and *Davis* apply to vest title to artificially-induced accretions in the upland owner, when that owner has not caused or directly participated in the artificial accretions.

■ In the present case, the artificial process of dredging the channel and placing the spoils on land near the shore was followed by the natural drift of this material on to the submerged lands along the shore. Here, as in *Baxter* and *Davis,* an artificial condition merely facilitated the process of natural forces carrying soil to either build up or erode the land in question. The action of the Corps of Engineers of depositing spoil material upland does not prevent the upland owner from gaining title to land created by the gradual run-off of that material.

The mere granting of an easement by the upland owner, allowing the Corps of Engineers to place the spoil material on dry land, was not sufficient participation by the owner to require forfeiture of his right to the resulting accretions under the principles of *Lorino.* Here, the trial court correctly granted summary judgment that Natland had acquired title to the land. We overrule the State's first point of error.

### B. The Public Trust Doctrine

In its second point of error challenging the summary judgment against it, the State of Texas argues the trial court erred in holding that 229 acres of submerged lands, when patented to Natland's predecessor in title, was not encumbered with an implied trust for the benefit of the public. The court held that Natland's predecessor in title received title in fee simple absolute encumbered only by those reservations expressed in the patent.

The land at issue consists principally of salt flats and a lagoon. It was conveyed by the State by Patent 198 to the San Patricio Navigation District No. 1 in 1958 under the authority of former Article 8225 (now

Tex.Water Code Ann. §§ 61.115–61.117 (Vernon 1988)). That statute gave navigation districts the right to purchase lands and flats owned by the State that are wholly or partially covered by waters of bays or arms of the Gulf of Mexico. Some of the land was later sold by the navigation district to the city of Ingleside. In 1973 the City and the navigation district conveyed the Patent 198 lands to Natland under the authority of Tex. Rev.Civ.Stat.Ann. art. 8247b § 1(c) (Vernon 1957), which allowed the district to dispose of surplus lands.

The statute allowing the State to sell land to the navigation district required certain reservations, principally concerning minerals and public uses. Those express reservations will be reached later in the opinion, and are not material to the State's claim in this point of error. The State maintains that there is an implicit reservation, created by operation of law, that restricts the development and use of the tract; that, in spite of the grant by the State, the public has rights to the land.

The State argues that in all Western ancient law, both common law and Roman, the sovereign holds title to the lands underlying the bays and offshore waters, as well as the shores, for the benefit of the public at large. All may use these public areas for fishing, maritime commerce, navigation, and related activities. Although the sovereign may hold title to the submerged lands, it holds it as trustee for the people, the public. The State maintains that although it may sell submerged lands, this must be done with specific legislative intent, and the land so sold must be used for purposes that are consistent with the public interests in the land. This imposition of a public trust on such lands has been recognized in some jurisdictions, in certain situations.

The primary authority in the United States for the public trust doctrine is the United States Supreme Court case of *Illinois Cent. R.R. Co. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). The Court considered Illinois's right to convey title to a large portion of submerged land along the Chicago waterfront on Lake Michigan, to be held by the private owner for railroad purposes as well as for the erection of wharves, piers, and docks. The Court concluded that the States' title to submerged lands differs in character from their title to dry land, and that the States hold their tidelands and lands beneath navigable waterways within their borders "in trust for the people of the State, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties." The Court held that the State may grant parcels of the submerged land so that commerce may be improved by the erection of docks, wharves, or piers, so long as the conveyance of the public trust lands are made for such public purpose.

The Court held that a disposition of submerged lands by the State for any purpose is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. *The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.* (emphasis added). *Id.* at 452–53, 13 S.Ct. at 118.

Based on the discussion of public rights in *Illinois Central R.R. Co.,* many States have developed their own versions of a "public trust doctrine" restriction that follows submerged lands conveyed into private hands by the State. *See State v. Central Vermont Ry., Inc.,* 153 Vt. 337, 571 A.2d 1128 (1989); *Orion Corp. v. State,* 109 Wash.2d 621, 747 P.2d 1062 (1987); *City of Berkeley v. Superior Court of Alameda County,* 26 Cal.3d 515, 162 Cal.Rptr. 327, 606 P.2d 362 (1980); *Boston Waterfront Dev. Corp. v. Commonwealth,* 378 Mass. 629, 393 N.E.2d 356 (1979). The United States Supreme Court later recognized that individual States may define the lands held in public trust and recognize private rights in such lands. *See Phillips Petroleum*

*Co. v. Mississippi,* 484 U.S. 469, 473, 108 S.Ct. 791, 794, 98 L.Ed.2d 877 (1988); *Shively v. Bowlby,* 152 U.S. 1, 26, 14 S.Ct. 548, 557, 38 L.Ed. 331 (1894). There is no universal, uniform law upon the subject, but each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy. *Phillips,* 484 U.S. at 481–84, 108 S.Ct. at 798–99; *Shively,* 152 U.S. at 26, 14 S.Ct. at 557.

This doctrine that the sovereign holds submerged lands in trust for the benefit and use of the public, thereby imposing on submerged lands granted by the State implied restrictions on their use and development, has not fared well in Texas jurisprudence.

In the seminal Texas case of *City of Galveston v. Menard,* 23 Tex. 349 (1859), the Texas Supreme Court upheld the validity of a patent of submerged lands existing from the end of Galveston Island to Menard. The court recognized that the State's right in coastal submerged lands is different from its right in uplands, because navigation and fishing rights are to be enjoyed in common by all people of the State. The court said that it is ordinarily best to devote the State's interest in water to public use. However, sometimes the public's use and enjoyment of that type of property can best be fulfilled by allowing portions of it to be used for wharves and docks. The court validated the patent in its entirety, including the submerged lands.

A portion of the Menard tract was the subject of a Supreme Court decision a century later in *State v. Lain,* 162 Tex. 549, 349 S.W.2d 579 (1961). A portion of the Menard tract was still submerged off the northwestern edge of Galveston Island, and the State built a ferry landing on and over it. The State argued that the public had certain rights over the land under the public trust doctrine, but the court stated,

> The power and intent of the Republic to grant the submerged area included in the patent to Menard in derogation of public rights of navigation, etc., was fully considered. The court confirmed the existence of both power and intent and recognized the absolute right of Menard and his grantees to fill up and use the submerged areas.... Defendants cite Illinois Central

Railroad Co. v. State of Illinois (cite omitted) and Darling v. City of Newport News (cite omitted) as reaching results contrary to the result reached by this court in the Menard case. We need not review the cited cases, for we regard our own decision as controlling.

*Id.,* 162 Tex. at 555, 349 S.W.2d at 583.

▪ We view *Lain* as controlling here. *See also Texas Parks & Wildlife Dep't v. Champlin Petroleum Co.,* 616 S.W.2d 668 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.). Accordingly, there were no implied reservations for the benefit of the public in the Patent 198 submerged lands. All reservations for the public use and benefit were explicit in the grant, subject to the rules of construction of those reservations. The trial court did not err in denying the State's motion for summary judgment. The State's point of error two is overruled.

## II. NATLAND'S APPEAL

We next address Natland's appeal of the judgment rendered in favor of Baker.

### A. Breach Of The Warranty Against Encumbrances

By its first through fourth points of error, concerning the 229 acre tract, Natland challenges the legal and factual sufficiency of the evidence to show a breach of warranty against encumbrances causing damages to Baker. Natland contends that the State granted a full fee simple estate to this land, which was conveyed without limitation into private hands in Natland's chain of title.

By Jury Questions 1 & 2, the jury found that Natland breached its warranty against encumbrances with respect to the spoil disposal easement and the Patent 198 reservations, both of which were a producing and proximate cause of damages to Baker. By Jury Question 17, the jury found that Baker suffered damages in the amount of $6,330,000 due to the Patent 198 reservations, but $0.00 damages with regard to the spoil easement.

▪ The statutory covenant against encumbrances, as provided by Tex.Prop.Code

Ann. § 5.023(a)(2) (Vernon 1984),[5] is implied from the use of the words "grant" or "convey" in a transfer of a fee simple estate, unless the express terms of the conveyance negate that implication. *City of Beaumont v. Moore*, 146 Tex. 46, 202 S.W.2d 448, 453 (1947). The covenant against encumbrances is distinct from a warranty of title and protects the grantee against interests in third persons which, though consistent with the fee being in the grantor, will diminish the value of the estate conveyed. *Id.* (Moore's mineral royalty interest burdened by the City's use of the surface of the land as an airport); *Texas & Pac. Ry. Co. v. El Paso & N. E. R.R. Co.*, 156 S.W. 561, 565 (Tex.Civ.App.—El Paso 1913, writ ref'd). Such a covenant is breached, if at all, upon the execution and delivery of the deed. *City of Beaumont*, 146 Tex. at 53, 202 S.W.2d at 453; *Texas & Pac. Ry. Co.*, 156 S.W. at 565.

In the present case, Baker alleged that its title to a portion of the land conveyed to it by Natland, the 229 acre tract originally granted by Patent 198, was subject to two specific encumbrances of which Baker was unaware and which diminished the value of the estate.

First, Baker alleged an encumbrance in the form of an implied navigational use restriction on the submerged portions of the Patent 198 lands. The original grant was authorized to encourage navigation and the creation of navigation districts, and although the property legally passed into private ownership, it is still restricted to navigational purposes.

Second, Baker alleged an explicit reservation for recreational purposes in Patent 198 that is an encumbrance that prevented it from developing the property.

## THE NAVIGATIONAL USE RESTRICTION

Title to submerged land owned by the State may only be acquired by grant express-

ly authorized by the legislature. *City of Galveston v. Mann*, 135 Tex. 319, 143 S.W.2d 1028, 1034 (1940); *State v. Bradford*, 121 Tex. 515, 50 S.W.2d 1065, 1069 (1932). Tex. Rev.Civ.Stat.Ann. art. 8225 (now Tex.Water Code Ann. §§ 61.115–61.117 (Vernon 1988)) gave navigation districts "the right to purchase from the State of Texas any land and flats belonging to said State, covered or partly covered by the waters of any of the bays or other arms of the sea, to be used by said District for the purposes authorized by law with the right to dredge out or to fill in and reclaim said lands or otherwise improve the same...."[6] The statute further authorized the Commissioner of the General Land Office to sell such land to the navigation district for the price of one dollar per acre, and to issue a patent "conveying to said District the right, title and interest of the State in the lands," subject to a specific reservation of the mineral interest to the State. Article 8225 thus allowed the State to convey submerged lands by patent in fee simple (except minerals) to a navigation district. *Champlin Petroleum Co.*, 616 S.W.2d at 671–72.

Under the authority of that statute, the State in 1958 patented 229 acres of submerged land to the San Patricio Navigation District No. 1, "to be used by said district for the purposes authorized by law with the rights to dredge out or fill in and reclaim said lands or otherwise improve the same." The patent, Patent 198, specifically reserved the mineral interest to the State and the right of the general public to use submerged portions for recreation.

The Navigation District conveyed some of the land to the City of Ingleside, Texas, in 1959.[7] In 1973 the Navigation District and the City of Ingleside jointly conveyed all the Patent 198 lands to National Steel Company for $344,257.50, by a warranty deed which

---

5. Formerly Tex.Rev.Civ.Stat.Ann. art. 1297 (repealed).

6. A navigation district created pursuant to the Texas Constitution is not merely a department, board or agency of the State, but is a political subdivision, similar to a county, city or other such body politic. *See Guaranty Petroleum Corp. v. Armstrong*, 609 S.W.2d 529 (Tex.1980).

7. Tex.Rev.Civ.Stat.Ann. art. 8247b § 1(c), as amended in 1957 (55th Leg., p. 170, ch. 77, § 1), in turn gave the Navigation District the authority to "sell or lease all or any part of any lands owned by it ... provided such lands are declared as surplus and are not necessary to be used by such Navigation District...."

generally duplicated the specific mineral interest and recreational reservations to the State.

Baker contends that Article 8225, which authorized the patent, specifies that conveyances were to be made to navigation districts for "purposes authorized by law," which constitutes a limitation on the uses of the submerged land consistent with the statutory powers of, and restrictions on, the Navigation District—in other words, the uses to which the Navigation District itself would be restricted under the Water Code. *See* Tex.Water Code Ann. §§ 60.001, *et seq.* (Vernon 1988); *see, e.g.,* Tex.Water Code Ann. § 61.-116(b) (Vernon 1988).

 It is a settled rule of statutory construction that it is proper to look at all parts of the legislative Act, and not merely an isolated portion thereof, to ascertain its proper construction and meaning, and thereby determine the legislative intent. *State v. Terrell,* 588 S.W.2d 784, 786 (Tex.1979); *State v. Aransas Dock and Channel Co.,* 365 S.W.2d 220, 222 (Tex.Civ.App.—San Antonio 1963, writ ref'd). Specifically with regard to the conveyance of State lands by patent, when the apparent purpose and intention of the authorizing statute as a whole is to convey fee simple title, a clause suggesting various specific purposes for which the land may be used is merely descriptive and does not act as a limitation or encumbrance upon the estate conveyed or restrict the use of the land to these purposes alone. *See Aransas Dock & Channel Co.,* 365 S.W.2d at 223. Generally, words in a deed merely showing the purpose of the grant and the use to which the property is to be put do not change the effect of the conveyance or limit the grant. *First Baptist Church of Fort Worth v. Baptist Bible Seminary,* 162 Tex. 441, 347 S.W.2d 587, 591 (1961).

In the present case, the clause providing that the property is "to be used by said District for the purposes authorized by law" is not by its terms a limitation on the uses of the land—nowhere does the statute or patent say that the lands may *not* be used for purposes that are unrelated to navigation or the business of a navigation district. Rather, this clause appears to be merely a recognition that the land may be used by the Navigation District for any authorized purpose. In other words, the quoted language is merely descriptive, rather than a limitation on title. *See Aransas Dock & Channel Co.,* 365 S.W.2d at 223.

While the Navigation District retained title to the lands, it is axiomatic that it could only use the land in accordance with the laws governing navigation districts. However, when title passed from the Navigation District to a third-party, it would seem awkward for that title to be encumbered by a restriction that would require the third-party to treat the land as if it still belonged to a navigation district. Nothing in the statute suggests that the legislature intended to encumber title in this manner. The statute intends to pass a clear title in fee simple (except minerals) to the navigation district. *See Champlin Petroleum Co.,* 616 S.W.2d at 672. To imply an additional encumbrance of the nature suggested by the State would only frustrate that intent.

### THE EXPRESS RESERVATION FOR RECREATION

The second encumbrance the jury found to cause damage to Baker was the reservation in Patent 198 to the public for recreational purposes. Patent 198 reserved mineral rights and also provided:

> There is further reserved to the State for the benefit of the general public the right to use that portion of the above described land which shall actually be covered by water for hunting, fishing or other recreational purposes, insofar as such use does not interfere with the function of the grantee navigation district as provided by law....

When, under the authority of article 8247b, the Navigation District and the City of Ingleside later conveyed the land to National Steel Company, the warranty deed contained a similar provision in substantially the same terms.

 Generally, reservations for public purposes in a grant will be liberally construed to give full effect to such reservation. *State v. Bradford,* 121 Tex. 515, 50 S.W.2d

1065, 1077 (1932). However, when the terms of the grant appear to reserve nothing more than what the laws of this State generally reserve in all lands similarly situated, we are reluctant to find such reservation to be a true encumbrance which may diminish the value of the estate. In the present case, the so-called "public use" reservation applies to the entire tract of Patent 198 lands that are or may become submerged, whether the submerged lands are in the form of an inland pond or are connected to the navigable waters of the adjoining coast. Baker, moreover, remained completely free under the explicit terms of the patent "to dredge out or fill in and reclaim said lands or otherwise improve the same."

Thus, if Baker were to leave the submerged lands in the form of an inland pond, the reservation would be meaningless, since the public would not thereby gain the right to trespass across the owner's property to enjoy their right to the recreational use of the submerged lands. *See Diversion Lake Club v. Heath*, 126 Tex. 129, 86 S.W.2d 441, 445 (1935); *Taylor Fishing Club v. Hammett*, 88 S.W.2d 127, 130 (Tex.Civ.App.— Waco 1935, writ ·dism'd); *Smith v. Godart*, 295 S.W. 211, 212 (Tex.Civ.App.—Texarkana 1927, no writ).

 On the other hand, if Baker were to dredge channels connected to navigable waters, the reservation would be equally meaningless in view of the fact that all such submerged lands are open to public recreational use. Our State generally recognizes the right of the public to the recreational use of public waters flowing over private lands even without an express reservation of such in the private owner's chain of title. Generally, a natural stream or watercourse on the land sold is not an encumbrance, nor are riparian rights in a river. 92 C.J.S. *Vendor & Purchaser* § 206e (1955). The rights of a proprietor to the flow of water on his property is not an easement, but rather is inseparably connected with, and inherent in, the land, part and parcel to it. 21 C.J.S. *Easements* § 46 (1990); *see Stanfield v. Schneidewind*, 96 N.J.L. 428, 115 A. 339, 340 (N.J.Sup.1921) ("Nothing which constitutes a part of the estate, or which, as between the parties, is to be regarded as an incident to which the estate is subject, can be deemed an encumbrance.")

Thus, even though submerged land may be privately owned, if navigable public waters flow over it, the public retains the right to use those waters for navigation, fishing, and other lawful purposes. *Diversion Lake Club*, 86 S.W.2d at 446; *Port Acres Sportsman's Club v. Mann*, 541 S.W.2d 847 (Tex.Civ. App.—Beaumont 1976, writ ref'd n.r.e.); *see also Carrithers v. Terramar Beach Community Improvement Ass'n*, 645 S.W.2d 772 (Tex.1983); *contra Fisher v. Barber*, 21 S.W.2d 569 (Tex.Civ.App.—Beaumont 1929, no writ) (owner of land under navigable waters was entitled to the exclusive enjoyment of all the rights inherent in such ownership, which includes the exclusive right of hunting and fishing thereon).

In *Diversion Lake Club*, the riparian owner of banks along both sides of a navigable river created an artificial lake covering both the original state-owned river bed and part of the privately-owned riparian lands. The Texas Supreme Court held that the riparian owner could not enjoin the public from fishing on all parts of the lake. The Court reasoned that,

> the water of the lake, notwithstanding the fact that most of its bed is privately owned, is still public water. . . . [Thus, the private owners had] no title to the fish in the water of the lake, no exclusive right to take the fish from the lake, and no right to interfere with the public in their use of the river and its water for navigation, fishing, and other lawful purposes. . . . This artificial change in the river and its bed did not affect the public nature of the waters and did not take away the right of the public to use them for fishing.

*Id.* at 446.

In *Mann*, a private club acquired marsh lands which had not been navigable at the time they were sold by the State into private hands. *Id.* at 847. Later, however, the continued use of airboats through the marsh artificially created a navigable stream which flowed over the marshlands. The private club sought to fence off this area and to prevent the public from fishing in the stream.

Following *Diversion Lake Club*, the Beaumont Court held that, although the private club had title to the underlying land, it did not have the exclusive right to fish in the overlying waters. *Id.* at 850.

We note that there is some out-of-state authority to suggest that a canal on private property, constructed and maintained with private funds and used for private purposes, is a private canal subject to private control. *See Vermilion Corp. v. Vaughn*, 356 So.2d 551, 555 (La.Ct.App.1978), *affirmed in part, and vacated and remanded in part*, 444 U.S. 206, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979); *cf. Hughes v. Nelson*, 303 S.C. 102, 399 S.E.2d 24 (Ct.App.1990) (continuous and unobstructed use of private canal by the public may establish public right to fish in the canal). However, the rationale of *Diversion Lake Club* suggests that such a canal in Texas would not be subject to exclusive private use so long as public waters flowed through it.

Therefore, in the present case, we do not believe that the terms of the patent and subsequent grant reserved any right of public recreational use that would not otherwise attach to navigable waters covering the property sold. Rather, we believe that the patent and grant merely restated and clarified the general public right to fish and hunt in navigable waters even on privately-owned submerged lands. The recreational use provision was thus merely *descriptive* of rights that the public already had and did not act as an additional *limitation* on title. *See Aransas*, 365 S.W.2d at 223.

We hold that the State's clarification of the right of public use in the terms of the patent did not constitute a true encumbrance such as to diminish the value of the estate conveyed. Thus, there was legally insufficient evidence to establish a breach of warranty against encumbrances such as to cause damage to Baker, whose plans for the property were not hindered to any greater extent by the terms in the patent than they naturally would have been subject to the rights of the public to use the navigable submerged lands for public recreation. Natland's first through fourth points of error are sustained.

## III. REMAINING POINTS OF ERROR

■ By points five through seven, Natland complains of the court's charge to the jury. The charge included, in conjunction with a question regarding damages due to any encumbrances on the property, an instruction quoting Article 8225. Natland contends that the language referring to the State's reservation of mineral rights in the property was irrelevant and misleading. Natland also contends that the court erred by including in the charge an instruction that the deed conveyed from the San Patricio County Navigation District No. 1 and the City of Ingleside to National Steel was subject to the reservations set out in Patent 198. Finally, Natland complains of the court's failure to include instructions regarding the uses Baker's Port could make of the property vis-a-vis the public's recreational rights.

■ The trial court has broad discretion when constructing the charge for the jury. So long as the instructions serve to aid the jury and are not clear misstatements of the law, the trial court has not abused its discretion when including them. *Boyer v. Scruggs*, 806 S.W.2d 941 (Tex.App.—Corpus Christi 1991, no writ); *Atchison, Topeka, & Santa Fe Ry. Co. v. O'Merry*, 727 S.W.2d 596 (Tex. App.—Houston [1st Dist.] 1987, no writ). The charge in this case aided the jury and did not misstate the law. Points of error five through seven are overruled.

■ Natland's eighth through tenth points of error generally challenge the sufficiency of the evidence to support the jury's award of $22,000,000 in Jury Question 18. Specifically, point eight suggests that a new trial is required to recalculate the Jury Question 18 valuation without consideration of the supposed encumbrances.

By Jury Question 18 concerning damages resulting from Natland's fraud and DTPA violations, the jury found that the value of the property as received was $22,000,000 less than its value as represented, yet that the value as received was equal to the consideration paid by Baker. In other words, the property had special value to Baker for the specific purposes which Baker envisioned. Moreover, these damages are based on the

assumption that the specific encumbrances alleged would prevent this planned development. Natland contends that because the jury improperly attributed this reduction in value to encumbrances here shown to have been of no effect on the land, a new trial is necessary to properly assess any reduction in the value of the land.

Larry Baker, Sr. testified that, if he had known of the spoil easement and the navigational and public use restrictions, he would not have purchased the property. Baker testified that because the encumbrances defeated the purposes for which he intended to use the property, it was only good for pasture land of a substantially reduced value. Baker valued the property with encumbrances at $9,500,000, substantially less than its value without encumbrances of $31,686,000. Baker claimed the difference of $22,186,000 as damages and the jury apparently agreed. Baker's testimony concerning the supposed decline in the value of the land because of these encumbrances thus forms the basis for the $22,000,000 in damages found by the jury.

However, the spoil easement was removed by Natland and the jury attributed no damages to it. As for the navigational and public use restrictions, we have already examined these in our discussion of Natland's first through fourth points of error. Since there was no evidence of a breach of a covenant against encumbrances on which Baker relies, there is no evidence to support these damages of $22,000,000. Appellants' eighth through tenth points of error are sustained.

■ By its eleventh and twelfth points of error, Natland challenges the legal and factual sufficiency of the evidence to support the amount awarded Baker on its breach of title claim for the State-owned submerged land mistakenly incorporated in the deed from Natland to Baker.

By Jury Question 19, the jury found that approximately 29 acres of State-owned submerged land between the shoreline and the U.S. Army Corps of Engineer's westerly 200–foot reference line had a fair market value of $360,000. The strip formed a part of Baker's Port's claim that Natland had fraudulently misrepresented its ownership of these submerged lands as included within its grant to Baker's Port.

An expert witness, Scruggs Love, placed a value of $10,000 per acre on shoreline lands. The tract specifically sought to be evaluated consisted of 29 acres. However, there was another tract involved in this case, a 36 acre tract, formerly submerged before becoming dry land as a result of accretion, which we discussed above in the State's appeal. That 36 acre tract was described during trial as laying between the 1958 shoreline and the present shoreline. A question remained whether the 36–acre tract included this 29–acre tract. We hold the jury's assessment of a $360,000 value for this 29–acre tract is against the great weight and preponderance of the evidence. Natland's eleventh and twelfth points of error are sustained.

■ By point 13, Natland contends that insufficient evidence exists to find that it committed fraud. Fraud requires a material representation, made by one knowing of its falsity or with reckless disregard for its truth, with intent that the statement be relied on by another who does so rely to its detriment. *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714 (Tex.1990); *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670 (Tex. 1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). Natland represented to Baker's Port that it would convey fee title to all of the land at issue. This it knowingly failed to do, particularly with regard to the submerged lands. We find sufficient evidence to support the jury's finding of fraud. Point of error 13 is overruled.

■ By point 14, Natland contends that as a matter of law, Baker's fraud defense to Natland's counterclaim was barred by waiver, ratification, and estoppel. There are no pleadings of waiver or ratification, both affirmative defenses requiring specific pleadings. *See* Tex.R.Civ.P. 94. Although the jury was asked about estoppel, it failed to find that Baker was estopped. The difficult test on appeal that appellant must meet is set out in *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686 (Tex.1989). Appellant has not so argued in its brief and we hold he has waived point of

error 14. *See* TEX.R.APP.P. 74(f). Point of error 14 is overruled.

■ By points 15 and 16, Natland maintains that two of the jury's findings were fatally conflicting. The jury found that Natland committed fraud, but that it did not knowingly violate the DTPA or engage in unconscionable conduct. Natland asserts that these answers are in fatal conflict. We disagree. The acts of fraud and a knowing violation of the DTPA possess differing elements. The jury's findings are not in conflict. Points 15 and 16 are overruled.

By points twenty and twenty-one, Natland complains of one jury finding and the trial court's disregard of another, both involving the submerged lands. We are remanding and this point is not dispositive. Points of error 20 and 21 are sustained.

We have addressed all issues raised and necessary to the final disposition of this appeal. *See* TEX.R.APP.P. 90(a).

In conclusion, we AFFIRM the summary judgment against the state of Texas. As to Natland's appeal of the judgment in favor of Baker, we REVERSE the judgment of the court and REMAND the case for trial consistent with this opinion.

NYE, former C.J., not participating.

APPENDIX

Map of Baker's Port

LEGEND

Existing Road and Western Shoreline
 --solid black line.

Garrett & Brashear Tracts and State-owned Submerged Land
 --solid black area.

Proposed Channels and Roads for Baker's Port
 --broken line.

Patent 198 Lands
 --dotted line.

1958 Shoreline
 --alternating broken/dotted line.

## OPINION ON MOTION
## FOR REHEARING

Among its grounds for rehearing, appellee Baker complains that we failed to address its two cross-points on appeal. It also says that our disposition leaves unclear the matters to be retried on remand. We write to address these concerns.

 The first cross-point complains that the trial court erred in denying rescission of the sale, which Baker sought under the provisions of Texas Deceptive Trade Practices–Consumer Protection Act, Tex.Bus. & Com. Code Ann. § 17.50(b)(3) (Vernon 1987). One who seeks to rescind an agreement because of fraudulent representations must show that he relied upon such representations and that the same induced him to execute the agreement. *Traders & General Ins. Co. v. Bailey,* 127 Tex. 322, 94 S.W.2d 134, 136 (Tex. Comm'n App.1936, opinion adopted). The DTPA remedy of rescission is merely a statutory recognition of the equitable remedy of rescission based on fraudulent misrepresentation. *See Schenck v. Ebby Halliday Real Estate, Inc.,* 803 S.W.2d 361, 366 (Tex.App.— Fort Worth 1990, no writ).

Baker's basis for rescission under the fraud and DTPA claims were the purported encumbrances on the title and the failure of Natland to convey submerged lands owned by the state that were shown as being part of the property. There was evidence that Baker relied on the absence of encumbrances; however, we held there were no encumbrances as a matter of law. As to the submerged lands, there was no evidence that Baker relied on representations that the state's submerged lands were in the tract purchased. There being no evidence of reliance, rescission is not a proper remedy. We overrule Baker's first cross-point.

By its second cross-point, Baker complains that the jury's finding of reasonable and necessary attorney's fees is against the great weight and preponderance of the evidence. We have reversed the judgment against Baker and remanded for trial a cause of action for which Baker was earlier awarded attorney's fees. Our disposition moots this claim of error. We overrule Baker's second cross-point.

Baker also contends that our earlier opinion is ambiguous as to what cause of action is subject to remand for a new trial. The only issue remaining for retrial is the breach of title cause of action concerning the State-owned submerged lands and related attorney's fees.

We overrule all motions for rehearing.

NYE, former C.J., not participating.