The JOHN G. AND STELLA KENEDY MEMORIAL FOUNDATION and Corpus Christi Diocese of the Roman Catholic Church, Appellants,

v.

David DEWHURST, Commissioner of the General Land Office and State of Texas, Appellees.

No. 03–96–00517–CV.

Court of Appeals of Texas, Austin.

May 27, 1999.

Paul W. Nye, Chaves, Gonzales & Hoblit, L.L.P., Corpus Christi, for Corpus Christi Diocese of the Roman Catholic Church.

Marc O. Knisely, Shannon H. Ratliff, McGinnis, Lochridge & Kilgore, L.L.P., Austin, for John G. & Marie Stella Kenedy Foundation.

John Cornyn, Attorney General, John B. McFarland, Graves, Dougherty, Hearon & Moody, Austin, for David Dewhurst, Commissioner & State of Texas.

Before Chief Justice ABOUSSIE, Justice B.A. SMITH, and former Chief Justice CARROLL.

MARILYN ABOUSSIE, Chief Justice.

This case illustrates the difficulty of drawing lines in the sand. The hundreds of exhibits at trial and hundreds of pages of briefing on appeal attest to the dramatically increased significance of placing such lines on sands that cover hydrocarbon deposits. The dispute between appellants, the John G. and Stella Kenedy Memorial Foundation and the Corpus Christi Diocese of the Roman Catholic Church (collectively the "Foundation"), and appellees, David Dewhurst,[1] Commissioner of the General Land Office and the State of Texas (collectively the "State"), concerns title to about 35,000 acres of coastal mud flats that are intermittently inundated by the waters of the Laguna Madre. Following a jury trial, the district court rendered judgment for the State. The Foundation raises eleven points of error; the State raises eight cross-points of error. We will affirm the trial court's judgment.

1. David Dewhurst has succeeded Garry Mauro as land commissioner and has been substituted automatically pursuant to Texas Rule of Appellate Procedure 7.2(a).

SOUTH TEXAS GULF COAST REGION

Figure One: Foundation trial exhibit three. The area enclosed in a rectangle is approximately the area featured in Figure Two.

Figure Two: Foundation trial exhibit ten.

## BACKGROUND

### A. The land at issue

The mud flats in dispute lie along the Texas coast south of Corpus Christi. As seen in Figure One, Padre Island shields more than one hundred miles of the Texas mainland from the open waters of the Gulf of Mexico. To the west, between Padre Island and the mainland, is the shallow body of brackish water known as the Laguna Madre. Running the length of the Laguna is the intracoastal waterway, a channel dug during the 1940s that provides a navigable watercourse protected from the Gulf waters by Padre Island. The disputed mud flats are to the west of the intracoastal waterway, on the margin between the Laguna Madre and the mainland. The flats are sometimes dry and sometimes covered by water.

The grants to the Foundation's predecessor-in-title set the Laguna Madre as the eastern boundary of the grants. The original grantees received title to the land abutting the Laguna Madre by two grants—La Barreta ("Big Barreta"), from the King of Spain in 1804 (plus the Mesquite Rincon addition of 1809), and Las Motas de la Barreta ("Little Barreta"), from the Republic of Mexico in 1834. The patent issued by the State of Texas in 1907 ("the *Spohn* patent") to confirm the Big Barreta grant states that the tract is "bounded on the east by the waters of the 'Laguna Madre'"; the metes and bounds description states that the grant's boundary proceeds from "a post on the Laguna Madre for the northeast corner of this survey; thence with the meanders of said Laguna Madre" generally toward the south as specified. Similarly the *expediente*, or certificate, to the Little Barreta grant states that the tract is bounded "on the east by the Laguna Madre"; the record of proceedings in the Denouncement of Lands refers to the surveyor measuring to "the edge of the Laguna Madre."

At the time of the grants and for many years afterwards, neither the grantees nor their successors disputed the State's claim to the mud flats. The State, considering the mud flats its property as submerged lands, leased the area for oil and gas exploration. The proceeds benefitted the Permanent School Fund, created to finance the free public schools for the children of Texas.

When the Foundation challenged ownership of the mud flats, the mineral lessees filed this suit as an interpleader action, asking that the court determine to whom they should pay the royalties.

## B. The applicable law

Consideration of this case both at trial and on appeal is controlled by long-standing principles for determining ownership of land. The overarching principle is that we must defer to the grantor's intent. If the grantor intends that the sea form a boundary of a grant, the supreme court has provided guidelines for determining where the land ends and the sea begins.

■ The intent of the original grantor, as manifested by the original survey, dominates the determination of property grant boundaries. *Wheeler v. Stanolind Oil & Gas Co.*, 151 Tex. 418, 252 S.W.2d 149, 152 (1952); *Woods v. Robinson*, 58 Tex. 655, 660–61 (1883). The survey made at the time of the grant controls if it can be found. *Fulton v. Frandolig*, 63 Tex. 330, 333 (1885). Also, if we can determine the grantor's intent, all else must yield. *Phillips Petroleum Co. v. State*, 63 S.W.2d 737, 745 (Tex.Civ.App.—Austin 1933, writ ref'd); *see also Strong v. Sunray DX Oil Co.*, 448 S.W.2d 728, 733 (Tex.Civ.App.—Corpus Christi 1969, writ ref'd n.r.e.).

The supreme court directed how to determine boundaries defined by seashores in *Luttes v. State*, 159 Tex. 500, 324 S.W.2d 167 (Tex.1958). The parties in *Luttes* were aligned similarly to the parties in the instant case. Luttes and the other plaintiffs owned mainland property that had as its eastern boundary the "western shore"[2] of the Laguna Madre. They, too, sought title to mud flats adjoining their property on the mainland, contending that the mainland shore of the Laguna had moved eastward from the time of the grants. *Id.* at 168. The case turned in part on the determination of how to find the shore. Because the grants came from Spain and Mexico, the supreme court reviewed Spanish and Mexican law applicable at the time of the grants to learn how to determine the boundaries. *Id.* at 176. That review included looking at language from Byzantine Rome's Justinian Code. *Id.* at 181–82. The court created a general rule for determining shorelines using tide gauges, but acknowledged that some circumstances might require using other methods. The court also discussed how to determine ownership of lands emerging from the former seabed.

■ Finding the shoreline is critical in cases involving coastal properties because submerged lands belong to the State. *See City of Corpus Christi v. Davis*, 622 S.W.2d 640, 644 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); *see also Lorino v. Crawford Packing Co.*, 142 Tex. 51, 175 S.W.2d 410, 414 (1943). The *Luttes* court defined the "shore" as "the area in which land is regularly covered and uncovered by the sea over a long period." 324 S.W.2d at 192. The landward or uppermost reach of the shore is the "shoreline" that divides submerged State lands from the upland or fast land that belongs to the sovereign's grantees or their successors. *See id.* at 191.

The *Luttes* opinion establishes a general rule that the shoreline for land-grants made by Spain or Mexico is the mean higher high tide line ("MHHT") as defined by tide gauges. *Id.* at 192. The MHHT is

---

**2.** The description that the land in *Luttes* is in Cameron County reveals that the area disputed in *Luttes* is several miles south of the Barreta grants in controversy in our case. *See Luttes*, 324 S.W.2d at 168.

found essentially by computing the mean of all the daily tides recorded in an 18.6–year tidal cycle; if there are two high tides in a day, the lower is disregarded. *Id.* at 187.

The court allowed for the possibility that exceptional conditions might require determination of the shoreline by methods other than exclusive resort to tide gauges to compute MHHT:

> If it be shown in a given case that the upper level of the shore, as actually covered and uncovered by the sea, is higher (or lower) than the level of mean higher high tide as determined by tide gauges, and if it also appears that an upper median line of the shore, as actually so regularly covered and uncovered, can be determined with reasonable accuracy otherwise than by exclusive resort to tide gauges, we do not by our opinion intend to foreclose such a case.

*Luttes,* 324 S.W.2d at 192.[3]

 Proving the shoreline does not necessarily end the inquiry into ownership, however. *Id.* at 187. If the shoreline moves landward and submerges formerly fast land, the newly submerged lands belong to the State. When the shoreline moves seaward, the newly emerged land is presumed to belong to the State absent rebuttal. *See id.* The owners of the land adjoining the new land must prove that the new land emerged naturally and adjacent to the boundaries of their upland estates. *Id.* at 187. The mere fact that fast land rises by accretion and adjoins the preexisting upland does not necessarily make it the property of the upland owner. *Id.* at 189. Establishing that the new land accreted to the owners' upland estate, and

not to State property (i.e. existing State lands or islands newly arising from the sea), can be quite difficult. *Id.*

On remand from the supreme court in *Luttes,* the court of appeals held that sufficient evidence supported the trial court's determination that the landowners failed to prove that any new land accreted to their upland estates. *Luttes v. State,* 328 S.W.2d 920, 923 (Tex.Civ.App.—Waco 1959, no writ). Thus, the lands the subject of the *Luttes* dispute remained the property of the State.

## C. The parties' positions.

The parties differ on how *Luttes* applies to this case. The Foundation requests computation of the shoreline based on the general rule of *Luttes.* It argues for a shoreline based on a set elevation on the mud flats. The State contends that conditions along the shore of the Barreta grants make tide gauges incapable of accurately describing that shoreline. The State argues that, because the inundation pattern on the mud flats has not changed since the time of the grants, the shoreline remains where the original grantors placed it.

The Foundation urges that, except for a small incursion of water on the southeastern corner, its property's eastern boundary is the western edge of the intracoastal waterway. The Foundation computed the MHHT, chose an elevation above that level, and surveyed to find where the mud flats rose above that level. The chosen elevation is one foot above the National Geodetic Vertical Datum of 1929 (1.0 NGVD)—essentially one foot above "sea level." The Foundation's survey, performed by Matt Claunch .and Bill Lothrop,

3. The facts of *Luttes* did not require the supreme court to consider whether to implement the exception. The court was considering the boundaries of properties along the Laguna Madre (to the south of the Barreta grants) for which the bluff line was originally the eastern boundary of the grants. *Id.* at 168–69. At the date of the grant, the area at issue in that case "was always covered by the waters of the Laguna" and remained covered

for well more than a half century thereafter; but at the time of suit it was not regularly covered and uncovered by the waters of the Laguna Madre, nor had it been for an extended period of time. *Id.* at 192. The court concluded therefore that using the bluff or vegetation line that the waters no longer regularly reached would not accurately determine the shoreline. *Id.*

shows that, using this elevation, the Laguna's mainland shoreline along the Barreta grants actually lies somewhere east of the intracoastal waterway. The Foundation nevertheless limits its position and claims ownership no further east than the western "shore" of the intracoastal waterway. The trial court referred to the shoreline described by the Foundation's surveyors as the Claunch–Lothrop Survey Line. The Foundation argues that it is not obligated to show that any new land accreted to the boundaries of the Barreta grants. It also contends that the State's position ignores *Luttes.*

The State proposes a meandering shoreline largely based on a line of vegetated bluffs that is sometimes as much as six miles west of the intracoastal waterway. This is the line described by Darrell Shine, the State's surveyor, who largely ignored MHHT and placed the Laguna Madre shoreline essentially where past surveyors placed it—at the vegetation or bluff line dividing the upland dunes from the mud flats. The State contends this departure from MHHT is required by the conditions on the mud flats. The State asserts that, from the time of the grants, the waters sometimes found on the mud flats were blown by seasonal winds rather than drawn there by astronomical tides alone. The State contends that the shallowness of the Laguna, the remoteness of this area from the Gulf of Mexico's tidal forces, and the consequentially enhanced impact of weather conditions on the reach of the Laguna waters renders tide gauges virtually useless to accurately describe the inundation patterns on these mud flats. The State argues that submergence of the disputed areas, though erratic, is certain to occur. Because this characteristic of the inundation patterns of the mud flats is unchanged from the time of the grants, the State contends, the upper limits of the shore should be determined as it was at the time of the Barreta grants, by reference to geographical features like bluff and vegetation lines. The trial court referred

to the shoreline described by the State's surveyor as the Shine Survey Line.

## D. The trial.

Both the Foundation and the State sought a declaration of the boundary between the lands of the Foundation and the State. The court submitted the following questions to the jury:

*Question No. 1*

Do you find that a line based upon "mean higher high tide" of the Laguna Madre can be drawn with reasonable accuracy to establish the eastern boundary of the Barreta Grants?

The eastern boundary of the grants is the line where the fast land stops and the shore of the Laguna Madre begins. The shore is that area regularly covered and uncovered by the waters of the Laguna Madre over a long period of time.

As a general rule, the boundary is determined by the line of "mean higher high tide." "Mean higher high tide" is the daily highest water level averaged over a complete tidal cycle of 18.6 years. All daily highest water levels are included in the average, whether those levels are caused by astronomical forces (for example, the gravitational pull of the moon), by weather conditions (for example, wind, temperature, and atmospheric pressure), or by both. In localities where tide gauge readings for so long a period are not available, the data is corrected by comparison with the nearest gauge that affords a record for 19 years.

This general rule does not apply, however, if the upper level of the shore, as actually regularly covered and uncovered by the water, is higher than any level of "mean higher high tide," and an upper median line of the shore, as actually regularly covered and uncovered by the water, can be determined with reasonable accuracy. In such a case, the boundary is this upper median line of the shore. In determining the coverage of the water, extraordinary storm conditions are not considered.

Answer "Yes" or "No."

Answer: *No.*

Regardless of your answer to Question No. 1, answer the following question.

*Question No. 2*

Do you find that the Claunch–Lothrop Survey Line (shown in green for the Big Barreta on Plaintiffs' Exhibit 112 and for the Little Barreta on Plaintiffs' Exhibit 21) is at or above the line of "mean higher high tide," if any, of the Laguna Madre?

"Mean higher high tide" is defined in paragraph two of the instructions accompanying Question No. 1.

Answer "Yes" or "No."

Answer: *Yes.*

If you have answered "No" to Question No. 1, then answer the following question. Otherwise, do not answer the following question.

*Question No. 3*

Do you find that the Claunch–Lothrop Survey Line (shown in green for the Big Barreta on Plaintiffs' Exhibit 112 and for the Little Barreta on Plaintiffs' Exhibit 21) marks with reasonable accuracy the line between the fast land and the shore of the Laguna Madre?

Answer "Yes" or "No."

Answer: *No.*

If you have answered "No" to Question No. 3, then answer the following question. Otherwise, do not answer the following question.

*Question No. 4*

Do you find that the Shine Survey Line (shown for the Big Barreta and Little Barreta on Defendants' Exhibit 593) marks with reasonable accuracy the line between the fast land and the shore of the Laguna Madre?

Answer "Yes" or "No."

Answer: *Yes.*

Based on the jury's answers, the trial court disregarded the answer to question two and declared that the State owns the disputed area. The trial court declined to award attorney's fees to either party. This portion of the suit was severed, leaving the remainder pending in the trial court.

## ANALYSIS

The Foundation raises eleven multi-faceted, overlapping points of error. Many of its assigned errors emanate from a conviction that the trial court misapplied or ignored *Luttes;* we will examine that argument before considering other issues.

### A. The trial court's submission did not violate *Luttes.*

■ After the jury found in answering question one that the MHHT Line did not accurately describe the shoreline of the Barreta grants, the court allowed the jury to consider whether a survey using criteria other than MHHT accurately described the shoreline. The Foundation contends that, under *Luttes*, the trial court should not have submitted jury questions on any boundary theory other than the MHHT Line.

The supreme court in *Luttes* announced a strong presumption that MHHT measured by tide gauges would determine the shoreline in civil law land grants. *Luttes,* 324 S.W.2d at 192. The supreme court chose MHHT over many other methods for determining civil law grant shorelines. *Id.* at 178–81. It decided the shoreline usually could be more effectively and accurately determined by using tide-gauge measurements than by finding a bluff line that the water formerly reached regularly. *Id.*

The supreme court recognized that tide gauges might not accurately describe every shoreline. *Id.* at 192. The Foundation argues that the exception allows only for more advanced or appropriate technologies than tide gauges to be used to determine MHHT. Though that interpretation is reasonable, it is not complete. The court in setting out the exception stated

that it seeks a reasonably accurate determination of the "upper level" of the shore as actually or regularly covered and uncovered by the sea, not unyielding adherence to a particular definition or elevation. *Id.* The use of the phrase "upper level of the shore" rather than MHHT must be more than a desire for verbal variety because the court was writing on rehearing to clarify its original opinion. We conclude that, besides allowing technologies other than tide gauges, the *Luttes* exception allows alternate accurate methods of finding the upper level of the shore.

By two points of error, the Foundation contends that the trial court disregarded *Luttes*, violating basic precepts of common, constitutional, and decisional law. By its seventh point of error, the Foundation argues the trial court erred by declaring the Shine Line to be the boundary because the State is judicially estopped from asserting that *Luttes* should be overruled or should not be applied; the Foundation argues that *stare decisis* requires application of *Luttes* and that the trial court's disregard for *Luttes* violated the Foundation's rights under the Equal Protection Clause of the Texas Constitution. *See* Tex. Const. art. I, § 3. By its eighth point of error, the Foundation argues that the trial court erred by deviating from a pretrial order in which the court determined that it would submit the cause in accordance with *Luttes*.

We will overrule these points because the trial court's rulings conform with *Luttes*. Though the State disputes the main rule of *Luttes*, the State does not argue exclusively for its overrule; the State also contends that this case fits within the *Luttes* exception because the MHHT method is inappropriate for the conditions peculiar to the Barreta grants. The trial court in its pretrial order acknowledged the uncertainty over the nature of the *Luttes* exception and its application, stating, "The present case is governed by *Luttes v. State*, though the correct application of that decision is in dispute." The pretrial order permitted

the trial court, under *Luttes*, to present non-MHHT theories to the jury if it found MHHT inadequate to describe the shoreline. Thus, the trial court applied *Luttes* and did not treat the Foundation differently from others to whom *Luttes* applies. Any argument in favor of rejecting *Luttes* was harmless because the trial court applied *Luttes*, including the *Luttes* exception. Because the trial court did not disregard *Luttes*, did not change its pretrial ruling, and did not thereby violate constitutional guarantees for equal rights, we overrule the Foundation's points seven and eight.

**B. The jury questions and instructions were not erroneous.**

**1. Jury question one and its instructions are not erroneous.**

The Foundation contends by point of error two and its many subparts that the trial court erred in several ways when asking in jury question one whether the MHHT Line can be drawn with reasonable accuracy to establish the eastern boundary of the Barreta grants.

■ We can deal with some of the contentions quickly:

► The Foundation's contention that jury question one did not set out a contested issue is refuted by the conflict apparent from the review of the evidence at trial and the jury's failure to find favorably to the Foundation. Whether MHHT marks the boundary of the Barreta grants is uncontested only if the Foundation concedes this issue.

► Jury question one is not a fragment of jury question two, which concerned whether the Claunch–Lothrop Line was above the MHHT Line. Whether the MHHT Line describes the property boundary is a question distinct from an inquiry about the relationship between the Claunch–Lothrop Line and the MHHT Line. Though jury question one may be narrow, it may

be read as the threshold factual issue on whether the facts of the case invoke the *Luttes*exception; it is sufficiently broad to serve that critical purpose.

► Jury question one did not improperly require the jury to choose between MHHT and the Shine Line. Jury question one does not refer to the Shine Line. The jury's failure to find in favor of the Foundation on jury question one invoked the *Luttes* exception and opened the door for consideration, not just of the Shine Line, but also of the Claunch–Lothrop Line.

► The Foundation also complains that the jury instructions given were confusing. The instructions it targets, however, draw language from *Luttes*. *See* 324 S.W.2d at 192. To the extent the instructions raised the possibility of other shoreline measures, they merely recount the exception from the caselaw. Instructing the jury on complex, applicable law is not erroneous. Our conclusion applies to all points of error addressing this issue.

 The Foundation also complains of the trial court's rejection of some requested instructions. The trial court should give instructions that are reasonably necessary to enable the jury to render a proper verdict. Tex.R. Civ. P. 277. We review the refusal to give instructions for an abuse of discretion. *Magro v. Ragsdale Bros., Inc.,* 721 S.W.2d 832, 836 (Tex.1986). The Foundation contends that the court should have given the jury the following additional instructions:

(i) Since the line represents a "mean" or "average" height of the water, there will be some days when the water is higher, or farther inland, and some days when the water is lower, or farther seaward than the mean higher high tide line. The boundary is not based on a position reached by the water only occasionally or for irregular periods of time, nor is the boundary based on a vegetation line, a bluff line, or meanders or points deter-

mined in previous surveys. "Fast land" is that land lying landward of the line of mean higher high tide.

(ii) It is not necessary to follow the rules, practices or procedures of the National Oceanic and Atmospheric Administration ["NOAA"] in order to determine mean higher high tide.

(iii) The "waters of the Laguna Madre" include the water within the Intracoastal Waterway. The construction, dredging and maintenance of the Intracoastal Waterway did not and do not affect or impair any of the Foundation's rights. A party may limit its claim, asserting ownership to less than that to which it is entitled.

The Foundation also contends that the court erred by failing to define the term "regularly" to mean "daily," either following the Foundation's request or the jury's request for a definition.

 The trial court did not commit reversible error by refusing to give the Foundation's first requested instruction. The first sentence of that instruction merely restates the essence of averages; the court did not abuse its discretion in deeming this unnecessary. The court did not err by declining to instruct that "irregular" or "occasional" inundation was insufficiently frequent coverage; that instruction would be redundant of instructions already given defining the shore as the area "regularly" covered and uncovered by the sea. Nor did the court abuse its discretion by refusing to instruct the jury to ignore landmarks and prior surveys as factors in finding the boundary. The Foundation's proposed instruction veers from defining the MHHT Line into defining the boundary, thus unequivocally equating the two and ignoring the *Luttes* exception; though the *Luttes* court clearly preferred MHHT to alternative methods of line-drawing, the exception does not exclude the possibility that landmarks might be useful in delineating the boundary on a particular set of facts. The trial court similarly did not abuse its discretion by

declining to give the MHHT-dependent definition of fast land because, if the *Luttes* exception applies, the requested instruction is not necessarily correct.

■ The jury's adoption of the Shine Line shows that the Foundation was not harmed by the trial court's refusal to give the second and third rejected instructions. The jury's adoption of the Shine Line shows MHHT was not a factor in finding this shoreline, so adherence to or departure from NOAA procedures in determining MHHT was irrelevant to the verdict. Likewise, adoption of the Shine Line, which is entirely west of the intracoastal waterway, shows the waterway was not a factor in the jury's decision.

The trial court did not abuse its discretion by not defining "regularly covered" as meaning daily coverage. The Foundation's argument is predicated partly on an assumption that the MHHT Line is the only line allowable under *Luttes*. Further, though MHHT theory requires daily *measurements* to show regular coverage, it does not require daily *coverage*. Averaging means that the tides on some days could be much higher than others. For example, assume that during the relevant period half the higher high tides are three feet, and the other half are one foot. The MHHT Line is two feet even though land above one foot was covered only half the days.

### 2. The trial court did not err by allowing evidence and asking questions about other shore measures.

#### a. The trial court did not err by admitting evidence of other shore measures.

■ By point of error six, the Foundation contends that the trial court erred by admitting evidence about the grantors' intentions regarding the original grant

boundaries as well as evidence about the Shine Line, the annual or semi-annual high tides, and ordinary high water marks. The decision whether to admit evidence rests within the discretion of the trial court. *New Braunfels Factory Outlet Ctr., Inc. v. IHOP Realty Corp.*, 872 S.W.2d 303, 310 (Tex.App.—Austin 1994, no writ). We can reverse only if the record shows the trial court acted unreasonably, arbitrarily, or without reference to any guiding rules or principles. *Id.*

■ Evidence of the original boundaries is important. If conditions and shorelines have not changed since the original grant, showing the grantor's intent regarding the original boundaries will dominate the determination of property grant boundaries. *See Wheeler*, 252 S.W.2d at 152. If conditions and shorelines indicate emergence of new land, then evidence of the original boundaries provides a starting line for proving to whose property the new land accreted. *Luttes*, 324 S.W.2d at 187. We stress that *Luttes* requires the owner of the upland estate claiming the new land to prove the new land "was a true accretion in the sense of a natural and imperceptible deposit *and* that it was an accretion to the *original boundary of the grant*." *Id.* (emphases added).[4]

■ The *Luttes* exception empowered the State to introduce evidence supporting its theory that the MHHT Line and Claunch–Lothrop Line were inappropriate and that another measure more reasonably accurately described the original and current boundaries. Any harm from the admission of the annual and semi-annual high tides evidence was cured by the instruction that coverage by the seawater had to be regular and not extraordinary. We overrule point six.

#### b. The trial court did not err by asking jury question three.

---

4. The same concerns apply to reliction, a slightly different process leading to the same result; reliction is an "increase of the land by the permanent withdrawal or retrocession of the sea." Black's Law Dictionary 1291 (6th ed.1990). For simplicity in discussion, we will use accretion to stand for the emergence of land by either accretion or reliction unless the difference is relevant.

By point of error four, the Foundation contends that the trial court erred by asking the jury to answer question three regarding the Claunch–Lothrop Line because the question did not present a controlling issue and was confusing. The Foundation also contends that the trial court should have submitted the instructions and definitions it requested.

The Foundation's argument is based in part on its mistaken belief that jury question two was dispositive. The answer to jury question two, that the Claunch–Lothrop Line is above the MHHT Line, could have been important had the jury also found that the Claunch–Lothrop Line described the shoreline. The jury's failure to find that the Claunch–Lothrop Line accurately describes the shoreline, however, rendered the relationship of the MHHT and Claunch–Lothrop lines irrelevant to the declaration of the property boundary lines. The affirmative response to jury question two was not dispositive because of the negative response to jury question three.

An affirmative answer to jury question three, however, could have controlled the judgment. After the jury rejected the MHHT Line as the shoreline of the grants in response to question one, jury question three presented another option under the *Luttes* scheme. Question three allowed the jury to express whether the Claunch–Lothrop Line accurately marks the shoreline. A jury finding that the Claunch–Lothrop Line marks "with reasonable accuracy the line between the fast land and the shore of the Laguna Madre" would have allowed the Foundation to claim the land above that line if the necessary accretion were also proved. We accordingly reject the Foundation's argument that jury question three was not controlling.

We also conclude that question three was not confusing when taken in conjunction with question one. The jury reached question three only if it answered question one negatively. Having rejected the MHHT Line as the boundary of the grants, the jury could consider alternative measures for the property boundary. The Claunch–Lothrop Line was one such alternative. The trial court's offer of it as an alternative was not confusing or erroneous.

We reiterate our conclusion that the trial court did not abuse its discretion in formulating its instructions. As discussed above, the trial court did not abuse its discretion by refusing the Foundation's definition of fast land. Defining fast land as that land above MHHT would have been even more confusing alongside jury question three because of the fact that the Claunch–Lothrop Line was undisputedly above the MHHT Line. The jury might have been puzzled by a definition of fast land based on MHHT coupled with a question that necessarily treated that fast land between the MHHT and the Claunch–Lothrop lines as not part of the upland estate and thus implicitly not fast land. By rejecting the proposed instruction, the trial court actually may have avoided confusion.

**c. The trial court did not err by asking jury question four.**

The Foundation contends by point of error five that the trial court erred by asking jury question four inquiring whether the Shine Line defined the boundary between the fast land and the Laguna Madre. We will deal with the bulk of the Foundation's assertions under point four when we consider the sufficiency of the evidence. For now, we will consider only whether the *Luttes* opinion prohibited, as a matter of law, a question regarding a line drawn by Shine's methods.

The *Luttes* court held that the vegetation or bluff line was inappropriate as a shoreline measure in that case. The *Luttes* court states that at the date of the grant, and for well over fifty years afterward, the area at issue in that case was *always* covered by waters of the Laguna Madre. *Luttes*, 324 S.W.2d at 169. The court wrote that by 1958, however, it was "quite plain to us that the area in suit is not

regularly covered and uncovered by the Laguna waters and has not been for a long time." *Luttes*, 324 S.W.2d at 192. The court held that, on the facts before it, the MHHT Line based on tide-gauge measurements was a much more reasonable line than a vegetation line marking where the waters "at some undisclosed period in the past evidently did reach with regularity." *Id.*

Nowhere, however, does the *Luttes* court state that vegetation or bluff lines cannot be used in conjunction with past surveys and other observations to determine current shorelines. The *Luttes* decision requires only that the alternate methods determine with reasonable accuracy the upper median line of the shore as regularly covered and uncovered. *Id.*

Factual distinctions with legal significance make the *Luttes* court's general rejection of vegetation or bluff lines inapplicable in this case. Though the grants in both *Luttes* and this case have as their eastern boundary the shore of the Laguna Madre, the nature of the Laguna Madre was apparently different at the more southern *Luttes* location. Unlike in *Luttes*, evidence in this cause indicates that these mud flats were not constantly covered by water at the time of the grants and have not been since. The descriptions of the disputed area of the Laguna Madre speak of useless "land" (Little Barreta, 1834) and intransitable bogs and strips linked by the continuous ebb and flow of the Laguna (Big Barreta, 1809). The 1909 Corps of Engineers' survey describes the disputed area as dry, with a crust covering six to ten feet of soft sand; the surveyor states that indications are that several inches of wind-driven water can cover the flats. The Foundation's surveyor Claunch testified that, though he could not vouch for specific elevations of particular sites, he believed that the general topography of the disputed area had not changed for 150 years. He believed that the surveyors used the vegetation or bluff line to define the boundaries of the grants rather than

the MHHT Line as defined in *Luttes*. The record contains ample evidence that, unlike in *Luttes*, the bluffs on the Barreta grants never defined the line below which water always or even daily covered; thus, under the exceptional conditions of the disputed area, the granting authorities defined the upper line of the shore in a manner irrespective of the MHHT Line. There is also evidence that landmarks have not changed appreciably over the nearly two centuries since the grants were made. There is conflicting evidence about whether the inundation patterns and frequency have reduced since the dredging of various canals, channels, and waterways.

The trial court did not err by asking the jury to consider whether, under the conditions in the disputed area, the Shine Line reasonably accurately defines the shoreline.

## C. The evidence was legally and factually sufficient to support the judgment.

The Foundation challenges the legal and factual sufficiency of the evidence to support the submission of jury questions, the jury's responses, and the judgment. We must review the evidence concerning the jury's failure to find that the MHHT Line accurately establishes the eastern boundary of the Barreta grants, its failure to find that the Claunch–Lothrop Line marks with reasonable accuracy the line between the fast land and the Laguna Madre shore, and its finding that the Shine Line does mark that line with reasonable accuracy.

When reviewing a factual sufficiency challenge, we must assess all the evidence and may not substitute our judgment for that of the trier of fact. When the challenge is to a finding on which the prevailing party had the burden of proof, we may reverse the judgment only if the challenged finding shocks the conscience or clearly shows bias, or the favorable evidence is so weak as to make the judgment clearly wrong and manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629,

635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). If the challenge is to an adverse finding (or failure to find) on which the appellant had the burden of proof, we may reverse only if the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Ames v. Ames,* 776 S.W.2d 154, 158 (Tex. 1989); *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651 (Tex.1988).

▆▆▆▆ In considering a legal sufficiency point, we consider only the evidence or inferences from the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). If the appellant did not have the burden of proof on the challenged finding, the appellant must show that no evidence supports the adverse finding; the challenge fails if more than a scintilla of evidence supports the finding. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The appellant must go one step further when attacking an adverse failure to find on which it had the burden of proof; that appellant must also show that the evidence conclusively established all vital facts in support of the issue. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex. 1982).

**1. Sufficient evidence supports the rejection of the MHHT and Claunch–Lothrop lines.**

By points of error two and four, the Foundation challenges the jury's failure to find in answering jury question one that the MHHT Line describes the eastern boundaries of the Barreta grants and its failure to find in answering jury question

three that the Claunch–Lothrop Line reasonably accurately describes the shoreline. The Foundation contends these failures to find are against the great weight and preponderance of the evidence and are wrong as a matter of law. The Foundation contends that *Luttes* requires a declaration that land above the MHHT Line is fast land, and requests a declaration that land above the higher Claunch–Lothrop Line is fast land.

**a. Sufficient evidence supports the jury's failure to find that the MHHT Line defines the original eastern boundary of the Barreta grants.**

▆▆▆ Pursuant to point of error two, we will review the factual and legal sufficiency of the evidence supporting the jury's failure to find that the MHHT Line describes the eastern boundary of the Barreta grants. For purposes of this part of our review, we will consider the question to refer to the original boundary of the grants. We will assume that the MHHT Line runs along the western edge of the intracoastal waterway, the eastern limit of the Foundation's claim.

Evidence that the disputed areas were within the original grants is limited. Shine conceded that the evidence showed that the disputed areas are and always have been mostly above the MHHT Line. Astronomical tides have never been a major factor in whether the disputed area is covered by water. The disputed area is several miles north of the Mansfield channel, the nearest Gulf access point. This distance from the Gulf and the shallowness of the Laguna minimize the effect of astronomical tidal forces on the Laguna in the disputed area. Wind sometimes pushes water across the mud flats at elevations above what the astronomical tides alone would cover.[5] Witnesses agreed that this

---

5. One exhibit showed a tide gauge near the intracoastal waterway, where the ground elevation was 0.74 NGVD, with a water level of 2.01 NGVD while a temporary tide gauge almost three miles northwest (toward Mesquite Rincon), where the ground elevation

was 1.90 NGVD, had a water level of 2.08 NGVD. Three miles further northwest (along Mesquite Rincon), where the ground elevation was 3.10 NGVD, the water elevation was 3.17 NGVD. The wind had apparently blown water uphill about three miles to cover a height

characteristic of the disputed area had persisted since the grants.

The documents regarding the original Barreta grants nevertheless indicate that the granting authorities and grantees recognized a shoreline well to the west of the current intracoastal waterway and the disputed area. There is no evidence that the 19th-century surveyors used the MHHT Line. The original exclusion and later addition of Mesquite Rincon to the Big Barreta indicates a mainland shoreline to the west of Mesquite Rincon, which itself is west of the intracoastal waterway and encompassed within the disputed area. De la Fuente's sketch of the Little Barreta resembles the curvature found by later surveyors. There is also no evidence that the original owners or their successors for the next century claimed the disputed area.

*i. The Mesquite Rincon.* A few years after Jose Francisco Balli received the original grant of the 25 *sitios* comprising the Big Barreta, he received a four-*sitio* area known as the Mesquite Rincon.[6] After the Big Barreta survey by Antonio Margil Cano in 1809, Balli wrote that he "went to the east side and saw several parcels of land *surrounded by brackish water* **adjacent** to those surveyed."[7] (Emphases added.) Balli petitioned for the additional grant of these parcels, described by the judge commissioner as "surrounded" by "impassable mires" and "brackish water" linked by strips created by "the continuous ebb and flow produced by the Laguna Madre." The judge commissioner wrote that the surveyor described the Laguna Madre as forming "on the east side a sort of semicircle almost embracing the two points of the south and the north boundaries." Concluding that

the additional land could be useful to no one but Balli because it was accessible only from his land, Spanish authorities added these parcels comprising four *sitios* to the Big Barreta grant. The Foundation notes that four *sitios* is about three times larger than the area Shine attributed to the Rincon.

The descriptions and proceedings leading to the addition of the Mesquite Rincon to the Big Barreta support the conclusion that Spain did not grant the disputed area to the Foundation's predecessors. As the Figure Two shows, had the original grant extended to the current site of the intracoastal waterway, it would have encompassed the Mesquite Rincon.[8] Instead, contemporary observers and surveyors said the Mesquite Rincon lay to the east of the granted land and was surrounded by the Laguna Madre. The original eastern boundary of the Big Barreta grant, defined by the Laguna Madre, was thus somewhere west of Mesquite Rincon and miles west of the current site of the intracoastal waterway. The four-*sitio* Mesquite Rincon grant included fewer than 18,000 acres, well less than the 35,000 disputed acres. Neither the original nor additional grant of the Mesquite Rincon included the disputed area.

*ii. The Little Barreta.* The circumstances surrounding the Little Barreta grant similarly illustrate that Mexico did not grant title to the disputed area to the Foundation's predecessors. When Mexico granted the Little Barreta to Leonardo Salinas in 1834, Salinas requested five *sitios* of land. When Domingo De la Fuente surveyed the land, he surveyed a rectangle enclosing five *sitios*, the southeast corner

---

almost a foot above where the astronomical tide alone would have taken it.

**6.** A *sitio* is 4,428 acres, or 5,000 *varas* square, or one square league.

**7.** The petition and the commissioner's responses were written in Spanish. The quoted language comes from translations of those documents.

**8.** We note that even the name by which the addition is known indicates the geographic character of the area. "Rincon" is a Spanish word for corner. *See* Appleton's New Cuyas Dictionary, Part II, p. 481 (5th ed. rev.1972). Had the grant encompassed all the disputed area, Mesquite Rincon would not have been a corner at all.

of which would have been located within the disputed area. The comments accompanying the map speak of reaching the "edge of the Laguna Madre" and continuing out into it in order to complete a rectangle, then excluding the part of the rectangle "where the Laguna Madre projects into the tract." De la Fuente attached a triangle of land of equal size to the eastern edge of the north line of the grant. Had the Little Barreta grant included the disputed area, it would have been larger than five *sitios* and there would have been no need to supplement the grant with the additional triangle to complete the fifth *sitio*.

The conclusion that the Big Barreta grant and the Little Barreta grant did not originally include the disputed area comports with concessions and findings in an earlier case to establish title to land that emerged from the Laguna Madre. *See Humble Oil & Refining Co. v. Sun Oil Co.*, 190 F.2d 191, 196 (5th Cir.), *on rehearing*, 191 F.2d 705 (1951), *cert. denied*, 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687 (1952). Some of the tracts involved in that suit are within the area disputed in this case. The court noted that maps historically have shown the Laguna Madre to be continuous and to separate wholly Padre Island from the mainland. *Id.* In the prior case, Elena Kenedy and Sarita Kenedy East conceded that the Big Barreta and Little Barreta grants did not originally include the land underlying the Laguna Madre, and argued that the disputed land had arisen from the Laguna Madre and accreted to their grants. *Id.* at 193. The Fifth Circuit affirmed the trial court's decision that the landowners did not prove that the emerged land accreted to their property. The Foundation does not urge on appeal that we find accretion in this case.

Legally and factually sufficient evidence supports the jury's failure to find that the MHHT Line accurately describes the contours of the eastern edge of the original grants. Their failure to find is neither against the great weight and preponderance of the evidence, nor is it wrong as a matter of law.

**b. The evidence supports the jury's failure to find either that the MHHT Line describes the current eastern edge of the Barreta grants or that the Claunch–Lothrop Line marks the boundary between the fast land and the shore.**

 The Foundation's undisputed evidence regarding elevations in the Laguna Madre does not require rejection of almost two centuries of interpretation of the grants and the topography in the disputed area.

The MHHT Line is almost entirely east-west along the Barreta grants' northern and southern lines extended to the intracoastal waterway. Though NOAA considers the astronomic tides too negligible and the atmospheric component too great to compute MHHT consistent with NOAA's needs,[9] the Foundation's tidal expert used tide gauges to compute an MHHT Line that uniformly fell below 1.0 NGVD. Only the Foundation's self-imposed eastern limit of the intracoastal waterway stops it from claiming the land up to the shore of Padre Island.

The Claunch–Lothrop Line similarly scarcely departs from the grants' northern and southern boundaries extended to the waterway. The Claunch–Lothrop Line extends east along the northern boundary of Little Barreta grant to the intracoastal waterway, then south-southwest along the western shore of the intracoastal waterway until just shy of the southern boundary of Big Barreta grant. It then curves to exclude the intrusion of the Hook section of the Laguna Madre.

Strict application of either the MHHT or Claunch–Lothrop lines would obliterate

---

**9.** The readings from one permanent and two temporary tide gauges support NOAA's asser-

tion. *See* note five, above.

long-held, common understandings of the area's geography. Coupled with the evidence of minimal (if any) change in the inundation patterns, use of either line would mean the disputed area is and always has been part of an isthmus connecting Padre Island to the mainland.[10] Evidence shows that past surveyors of the grants used the vegetation or bluff line as the boundary, despite inundation patterns similar to today's. Surveyors and mapmakers since the grants have also opted against using the MHHT Line in favor of the vegetation or bluff line in the disputed area. Collectively, the evidence indicates that the inundations of the disputed area were sufficiently regular to make the grantors and grantees consider the disputed area part of the sea.

Two surveys almost a century after the original Barreta grants indicate very little change in conditions from the time of the grants. J.J. Cocke surveyed both Barreta grants in the late 1800s. He conducted his 1879 survey of Little Barreta to confirm the boundaries of the grant. His map of the Little Barreta closely resembles de la Fuente's sketch. Cocke's 1884 map of Cameron County shows the disputed area as part of the Laguna Madre with the notation that the stretch of the Laguna between Mesquite Rincon and Padre Island is "fordable at times." F.M. Maddox surveyed the Big Barreta in 1907 to support the issuance of a patent on the grant following the *Spohn* decision validating the Big Barreta grant. *See State v. Spohn*, 83 S.W. 1135 (Tex.Civ.App.—Austin 1904, writ ref'd). His map showing the "east end of the Jose Francisco Balli survey" shows Mesquite Rincon jutting out into the Laguna Madre. A composite map drawn from Maddox's survey and Cocke's survey shows substantial similarities; though in some places Maddox's line is further west, the surveyors agreed that the Laguna Madre virtually surrounded Mesquite Rincon and that the grant ended west of the disputed area.

Other descriptions and surveys from the early 1900s confirm that similar conditions persisted. The Army Corps of Engineers surveyed the Laguna Madre in 1909 to study the feasibility of an inland waterway. The surveyors walked across nineteen-and-one-half miles of dry flats at or near the disputed area. They wrote that "[i]ndications are that during a strong norther or during a storm it has a few inches of water over the entire surface." A 1913 map of Kenedy County (formerly part of Willacy County) shows the Laguna Madre covering the disputed area, with the Barreta grants accordingly stopping west of the disputed area; the stretch of the Laguna between the Barreta grants and Padre Island is designated as mud flats. A 1915 map of the lands of the Kenedy Pasture Company, a predecessor in title to the Foundation, shows a similar conception of the grants and the Laguna Madre.[11]

Aerial photographs from 1980 and 1992 show a distinct line of vegetation or bluffs that resembles closely the boundary line found by prior surveys.

Experts for the State and Foundation agreed that the elevation of the disputed area had changed very little since the grants. They concurred that, though dredging of various waterways may have altered inundation patterns, inundation continues to occur much as it has for centuries. The Foundation's experts opined that the artificial waterways had reduced the frequency of inundation, but a State expert testified that his models showed that the channels did not contain sufficient

10. The Foundation asserts that it could have claimed to the boundary of Padre Island, but instead limits its claim only to the western edge of the intracoastal waterway. Using an MHHT Line, there is no boundary between Padre Island and the mainland along much of the disputed area.

11. We also note that evidence considered only by the trial court showed that neither the Foundation nor its predecessors rendered the area for property taxation until 1987.

volume to materially affect the amount of water inundating the disputed area.

Based on this evidence, the jury failed to find that an MHHT-based line can be drawn with reasonable accuracy to define the eastern boundary of the Barreta grants and failed to find that the Claunch–Lothrop Line marks with reasonable accuracy the line between fast land and the shore in the disputed area. Because these lines differ markedly from the historical conception, and there is evidence that inundation conditions have not changed here from the time of the grants, we conclude that neither jury answer is either against the great weight and preponderance of the evidence or incorrect as a matter of law.

**2. Legally and factually sufficient evidence supports the adoption of the Shine Line.**

■■■ By point of error five, the Foundation contends that the evidence is factually and legally insufficient to support the jury's finding that the Shine Line defines the boundary between the shore and the fast land. We conclude the contrary is true.

Shine conducted his survey from 1987 through 1993. He reviewed historical documents and conducted his own ground survey. He reviewed the grants, prior surveys, the *Spohn* patent, historical photographs, court cases, and NOAA information. Shine traced on the ground the lines of Cocke's surveys of Little Barreta and Big Barreta, finding many of his landmarks. Cocke, who performed the survey for the State believing the State owned the land, considered the disputed mud flats part of the Laguna Madre. Shine also considered the 1907 Maddox survey, conducted after the *Spohn* case to determine the boundaries of the Big Barreta grant, which itself generally followed Cocke's survey lines. Shine followed the lead of his predecessors and traced the shoreline generally according to the abrupt change from vegetated upland to mud flats. He concluded that the mud

flats were covered by water several times a year as they had been since the time of the grants. Shine's placement of the shore based on his refinement of the earlier surveyors' meander lines adds 2,083.815 acres to Maddox's survey of the Big Barreta and 933.313 acres to Cocke's survey of Little Barreta.

The geography and history of the grants support the jury's conclusion that the Shine Line reasonably accurately marks the line between the fast land and the shore. Two factors supporting this conclusion are key: the extent of the original grant and the lack of change in conditions.

Evidence of the original boundaries can show the extent of the original grant and may help show the current boundaries if conditions have not changed. The intent of the original grantor, as manifested by the original survey, dominates the determination of property grant boundaries. *Wheeler,* 252 S.W.2d at 152; *Fulton,* 63 Tex. at 333; *Strong,* 448 S.W.2d at 733; *Phillips Petroleum,* 63 S.W.2d at 745. As set out above, the descriptions in the granting documents and supporting Spanish and Mexican surveys consistently describe a line similar to that found by Shine. Intervening surveys hewed to the view that the vegetation or bluff line essentially defined the edge of the Laguna Madre, and thus the property line. Claunch agreed that the earlier surveyors likely did not employ the MHHT interpretation of the shoreline he used and instead probably followed the vegetation or bluff line. No survey in evidence other than Claunch–Lothrop hinted that the original grants extended east to abut the Padre Island grants.

Evidence supports the idea that conditions have not changed appreciably since the grants. Comparison of aerial photos, Shine's survey, and earlier maps, and even some of Claunch's testimony supports this conception. The Shine Line clearly accords more land to the Foundation than any previous similar survey; the State contends this augmentation, much smaller

than the disputed area, is due to Shine's "refinements" of past surveys. As we have discussed above, there is conflicting evidence about whether the pattern of inundations is different or inundations are less frequent. This evidence could support the jury's conclusion that the expanded fast land included by the Shine Line accounts for changes in the shoreline as it has been defined on this stretch of coastline. This case differs from the facts in *Luttes* which showed that the land in dispute was originally, but was no longer, always covered by water. 324 S.W.2d at 169.

Use of the Shine Line is supported by evidence that it applies seashore boundary law to these grants consistent with the way the Spanish and Mexican grantors applied it to this area. Factually sufficient evidence supports an implicit finding that the grantors and grantees considered the inundation up to the vegetation or bluff line sufficiently regular to establish the vegetation or bluff line as the boundary between land and sea. Factually sufficient evidence also supports an implicit finding that the inundation pattern has not changed since then. Finally, factually sufficient evidence supports the finding that the Shine Line reasonably accurately describes the line between fast land and the shoreline as defined by the original grantors and subsequent landowners.

Our decision is unaffected by the Foundation's charge that affirmance of this judgment would "threaten seashore boundaries and private landowners' vested property rights along the entire Texas coast." The Foundation contends that the result will be a crazy quilt of boundaries haphazardly determined. Yet, Texas still honors the shorelines of Spanish and Mexican civil-law grants (using MHHT, mean *higher*

high tide line) despite having abandoned that rule in 1840 and used the common-law definition of shoreline (mean high tide line) for all subsequent grants. The result is that adjacent civil- and common-law grants could have different shorelines based on the same data.[12] Allegiance to the methods governing determination of original boundaries requires honoring how the granting sovereign applied those methods to a particular area. Our holding regarding the appropriate method for finding the shoreline of these grants is limited to the peculiar geography and history of these grants. We would do greater violence to property rights and jurisprudence if we disregarded the original boundaries and reset them by applying a wholly different set of standards to essentially unchanged conditions.

### D. The Foundation is not entitled to rendition of judgment in its favor.

Because the jury did not return favorable findings on the issues of original ownership and accretion, the remaining errors the Foundation asserts do not require rendition of judgment in its favor. We have discussed the evidentiary support for the jury's finding regarding the original extent of the grant. We turn to the impact of the absence of accretion findings.

■ Case law governing presumptions and burdens of proof regarding ownership of accreted land defeats the Foundation's argument that the current MHHT Line is presumptively the property boundary. The Foundation bases its contention on *State v. Balli*, 144 Tex. 195, 190 S.W.2d 71, 100 (1944). We first note that, in the event of conflict, the *Luttes* holding prevails because it was written fourteen years after *Balli*. But the cases are not incom-

---

12. The abandoned civil-law method was more favorable to the State because the Texas coast often has two daily high tides. The civil-law system disregards the lower of these tides, but the common-law system adds them all together. Using an example not based on actual tidal data, assume the two daily high tides for

the relevant period are 2.0 feet and 1.0 feet. Under the civil-law system, the line would be 2.0 feet, while the common-law line would be at 1.5 feet. Under the civil-law system, the State claims 0.5 feet further inland as submerged land.

patible. The court wrote in *Balli* that any change in the tide line *ipso facto* changed the seashore and thus the property boundary and that alluvion forming above the tide line should become "part of the contiguous upland estate." *Id.* Under *Luttes,* the alluvion becomes part of the upland estate if the landowner proves that the new land actually accreted to the landowner's property and not to State lands. *See Luttes,* 324 S.W.2d at 187; *see also Humble Oil,* 191 F.2d at 717. The landowner's burden is not altered by our holding that the boundaries of private land automatically recede when the shoreline encroaches onto formerly fast land. *See City of Corpus Christi,* 622 S.W.2d at 642–44. This distinction exists because of the presumption that all submerged land belongs to the State. If the State proves a landward movement of the shoreline, newly submerged land belongs to the State. Private landowners do not enjoy a reciprocal presumption toward newly emerged land. *See Luttes,* 324 S.W.2d at 187.

The jury's finding that the area landward of the Claunch–Lothrop Line was above the MHHT Line was, by itself, insufficient to prove that area belonged to the Foundation. Under *Luttes,* the Foundation had to prove either that it always owned the disputed area or that the disputed area accreted to the original boundary of the Barreta grants in order to prove ownership. *See* 324 S.W.2d at 187. In the only question arguably addressing the original boundary, the jury failed to find that the MHHT Line accurately described the boundary of the Barreta grants. The Foundation did not request or receive a fact-finding that the new land accreted to its land. For the Foundation to obtain rendition of judgment in its favor, therefore, the evidence in the appellate record must prove such ownership or accretion conclusively. *See* Tex.R. Civ. P. 279; *University of Tex. at Austin v. Ables,* 914 S.W.2d 712, 715 (Tex.App.—Austin 1996, no writ).

The record does not show either that the original grants included the disputed area or that the Foundation gained it by accretion. We have discussed above the evidence showing that the Foundation's predecessors did not own the disputed area. Even if the disputed area has become fast land since the grants, the evidence in the record does not conclusively prove the accretion necessary for the Foundation to prevail. Though the disputed area is undisputedly adjacent to the Foundation's upland estate, the evidence does not show conclusively that the new land arose gradually beginning with the original edges of the grant and working seaward, as required by *Luttes.* *See* 324 S.W.2d at 189–90. There is evidence of State-owned lands in the disputed area to which some or all of the new land could have accreted. There also is evidence that the extent of the water's coverage is essentially unchanged since the grants were made. We are left with the presumption that emerged land belongs to the State until the proper accretion is shown. *See id.* at 187. The evidence does not show conclusively that the disputed area accreted to the Foundation's upland estate.

In the absence of needed findings, the remainder of the Foundation's complaints cannot demonstrate error requiring rendition of judgment in its favor. Even if the other submitted jury questions and answers were flawed as the Foundation suggests, the Foundation could not have prevailed because it did not obtain favorable findings on original ownership and accretion. Even had the trial court excluded non-MHHT theories of shoreline location and excluded evidence regarding those non-MHHT theories, the Foundation could not have shown itself entitled to judgment. Likewise, the absence of those findings means that no error by the trial court in making findings after the jury trial or in applying principles of res judicata and collateral estoppel denied the Foundation its requested declaration.

### E. The trial court did not err in reaching its judgment based on the jury's answers.

The Foundation asserts that the trial court's judgment misapplies the jury's answers. The Foundation argues that the trial court's improper reliance on the answers to questions one, three, and four caused it to disregard the answer to the only material and controlling question—jury question two.

The trial court correctly applied the jury's findings. It properly read the answers to jury questions one, three, and four as a rejection of the MHHT Line and Claunch–Lothrop Line in favor of the Shine Line. If the jury had found that the MHHT Line described the original eastern boundaries of the Barreta grants and that the Claunch–Lothrop Line described the current shoreline, the answer to jury question two could have established the validity of the Claunch–Lothrop Line within the MHHT framework. Instead, because the jury rejected the Claunch–Lothrop Line in favor of the Shine Line, the interrelationship of the MHHT and Claunch–Lothrop lines is irrelevant to the declaration of the property boundary lines. In context of all the jury's answers, the answer to question two does not control the judgment.

We overrule points of error one through five.

### F. The trial court's opinions do not make the judgment improper.

In its ninth point of error, the Foundation contends the trial court erred by basing its judgment on its "opinions" purporting to make findings of fact and conclusions of law which are improper when the cause is tried to a jury. The Foundation additionally contends the opinions contain erroneous statements of law and that the facts presented are contrary to the great weight and preponderance of the evidence.

We do not find reversible error. It is generally improper for a trial court to make findings of fact and conclusions of law following a jury trial. *See* Tex.R. Civ. P. 296; *Rathmell v. Morrison*, 732 S.W.2d 6, 16 (Tex.App.—Houston [14th Dist.] 1987, no writ). Findings of fact set out in a trial-court memorandum are not findings of fact as contemplated by Texas Rules of Civil Procedure 296–299. Though more formal than comments on the record or an opinion letter, the "findings" set out in an "opinion" are explanatory at best and not binding. *Cf. Cherokee Water Co. v. Gregg County Appraisal Dist.*, 801 S.W.2d 872, 878 (Tex.1990) (letter from trial court setting forth its opinion on an issue did not contain findings of fact as contemplated by Rule 296–299); *Ikard v. Ikard*, 819 S.W.2d 644, 647 (Tex. App.—El Paso 1991, no writ). We do not review an opinion written by a trial court and it has no persuasive value for an appellate court. We review the trial court's judgment and determine whether it is supported by the jury's verdict based on the evidence..

The trial court's opinions did not alter the law, the evidence, the judgment, or our conclusions based on our review of them. For the reasons before stated, the trial court's judgment is sound. It stands on the jury's findings, which are supported by legally and factually sufficient evidence. We overrule the Foundation's ninth point of error.

### G. We disregard moot issues

In its tenth point of error, the Foundation argues that *res judicata* and collateral estoppel are not applicable to this cause. Having determined that the State prevails without resort to these theories, we need not address this point of error.

The State's cross-points one through seven address concerns raised only if we determined certain issues adversely to the State. Because we have decided the trial court correctly ruled in the State's favor, we need address only the contention that the trial court should have awarded the State attorney's fees.

### H. The trial court did not err by failing to award attorney's fees and costs.

Both the Foundation and the State contend they were entitled to an award of attorney's fees and costs. Both sought attorney's fees and costs under the Uniform Declaratory Judgments Act. Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001— .011 (West 1997). The Foundation sued under the Act because the Natural Resources Code expressly provides that a declaratory judgment action may be brought against the State by littoral owners "whose rights may be affected by an action of the [School Land Board]...." Tex. Nat. Res.Code Ann. § 33.171 (West 1978). Equitable and just attorney's fees and costs can be awarded under the Act in connection with a suit for declaratory judgment. Tex. Civ. Prac. & Rem.Code Ann. § 37.009. The award is not mandatory. The Foundation also sought attorney's fees and costs for defending a frivolous suit brought by a state agency. *See id.* §§ 105.001—.004 (West 1997).

 The grant or denial of attorney's fees in a declaratory judgment action lies within the discretion of the trial court, and we will not reverse its decision absent an abuse of discretion. *Oake v. Collin County*, 692 S.W.2d 454, 456 (Tex.1985). The Foundation did not prevail, and we find no abuse of discretion in the denial of its claim for attorney's fees and costs. The State's victory denied the Foundation recovery under Chapter 105. Though the State prevailed, we do not find that the trial court abused its discretion in denying an award of attorney's fees to the State. We overrule the Foundation's eleventh point of error and the State's eighth cross-point.

### CONCLUSION

Sufficient evidence supports the jury's finding that the Shine Line marks the boundary between the Laguna Madre and the Foundation's property. The Shine Line is an acceptable alternative under the *Luttes* exception to the general rule adopting the MHHT Line. There was evidence supporting the jury's conclusion that the Shine Line determines the shoreline along the eastern boundary of the Barreta grants with reasonable accuracy. The evidence did not require findings that the Foundation either originally owned the disputed area or acquired ownership through accretion or reliction. Finally, the trial court did not abuse its discretion by refusing to award attorney's fees to either party and by refusing to award other costs to the Foundation. Having overruled or dismissed each of the Foundation's points of error and the State's cross-points of error, we affirm the judgment of the trial court.

CARROLL, former C.J., not participating.